Larry D. FITZGERALD,
Petitioner–Appellant,

v.

CITY OF MARYLAND HEIGHTS, Missouri, et al., Defendants–Respondents.

No. 57124.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 21, 1990.

Michael A. Turken, Leslie Ann Broome, St. Charles, for petitioner-appellant.

Frank Susman, Clayton, for defendants-respondents.

SATZ, Presiding Judge.

Petitioner, Mr. Larry D. Fitzgerald, a former mayor of the City of Maryland Heights, appeals his impeachment by the City Council of that third class city. The Mayor petitioned the circuit court for review of the City Council's decision, joining both the City Council and the individual Councilmen as respondents. The court affirmed the Council's decision. We likewise affirm that decision.

Section 77.340[1] authorizes the impeachment of the Mayor "for cause shown."[2] The Mayor argues this statutory language is unconstitutionally vague and, therefore, the statute is void. We disagree.

1. All statutory references are to RSMo. 1986, unless otherwise stated.

2. Section 77.340 provides in pertinent part:
The mayor may, with the consent of a majority of all the members elected to the city council, remove from office, for cause shown, any elective officer of the city, such officer being first given opportunity, together with his wit-

■ The "void-for-vagueness" doctrine stems from the Due Process Clauses of the 14th Amendment, United States Constitution, and Art. 1, § 10, Missouri Constitution. These clauses require that statutes whose enforcement may result in a deprivation of liberty or property be worded with precision sufficient to enable reasonable people to know what conduct is proscribed so they may conduct themselves accordingly. *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222, 227–228 (1972); *State ex rel. Cook v. Saynes*, 713 S.W.2d 258, 260 (Mo. banc 1986). This requirement of reasonable precision is also directed to those who must apply the statutes and, thus, makes arbitrary or discriminatory law enforcement less likely. *Id.* By focusing on whether the "for cause shown" standard in § 77.340 provides precision consistent with due process, both parties implicitly acknowledge that the Mayor had a constitutionally protected property interest in retaining his office until the expiration of his term. Therefore, we only decide whether the "for cause shown" standard in § 77.340 is sufficiently precise to pass constitutional muster.

■ "[T]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the [challenged] enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 371 (1982). There is greater tolerance of non-criminal laws "because the consequence of imprecision is qualitatively less severe." *Id.* Language which reasonable people can understand is not impermissibly vague merely because it requires interpretation on a case-by-case basis. *Saynes, supra*, 713 S.W.2d at 261.

nesses, to be heard before the council, sitting as a court of impeachment. Any elective officer may, in like manner, *for cause shown*, be removed from office by a two-thirds vote of all the members elected to the city council, independently of the mayor's approval or recommendation.... (emphasis added)

■ The parties have not cited, nor has our research disclosed, any Missouri case addressing the precise constitutional issue of whether a statutory "for cause" standard is void for vagueness. In the context of § 79.240, which authorizes the impeachment of mayors of fourth class cities, this Court, in dicta, has construed the phrase "for cause shown" to mean "a legally sufficient ground or reason," the determination of which necessarily depends upon the facts of the particular case. *State ex rel. Hall v. Wolf,* 710 S.W.2d 302, 303 (Mo.App. 1986). This definition is consistent with our Supreme Court's interpretation of what "for cause" meant in a predecessor to § 84.150, which permits removal of police officers:

> "for cause" means legal cause. It "must be one which specifically relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public."
>
> *McCallister v. Priest,* 422 S.W.2d 650, 657 (Mo. banc 1968).

Other courts confronted with challenges to the constitutionality of a "for cause" standard have uniformly held that this language is sufficiently precise to pass constitutional muster. E.g. *Napolitano v. Ward,* 317 F.Supp. 79, 81 (N.D.Ill.1970) *Sarisohn v. Appellate Division, Second Dept.,* 265 F.Supp. 455, 458–59 (E.D.N.Y. 1967); *Friedman v. New York,* 24 N.Y.2d 528, 301 N.Y.S.2d 484, 492, 249 N.E.2d 369, 377 (1969). *See also Lehman v. Alabama Board of Public Accountancy,* 263 U.S. 394, 395, 44 S.Ct. 128, 129 68 L.Ed. 354, 355 (1923). These courts define the term "for cause" in language similar to that used in *Wolf, supra,* 710 S.W.2d at 303, and *McCallister, supra,* 422 S.W.2d at 657. More important, according to these courts, the primary significance of a "for cause" standard is to create a constitutional right to a hearing at which specific cause must be demonstrated. E.g. *Napolitano, supra,* 317 F.Supp. at 81 ("the words [for cause] connote the necessity for a hearing"); *Sarisohn, supra,* 265 F.Supp. at 458 ("the phrase employed is only a practical means of providing flexibility"). Based on these interpretations, these courts have held that a "for cause" standard is not void for vagueness. We find their reasoning persuasive.

It would be practically impossible and socially undesirable to enumerate in a statute all conceivably valid grounds for removing a public official. *See, e.g., Friedman, supra,* 301 N.Y.S.2d at 491, 249 N.E.2d at 376. The inevitable incompleteness of any list of specific causes for removal would be detrimental to the public welfare, which government employees in general and elected officials in particular, are obviously supposed to serve. The "for cause" standard provides the flexibility necessary for assessing the performance of public officials, while also creating a constitutionally protected property interest. The office holder can be deprived of that property interest only upon notice of the specific causes for his proposed removal and after an opportunity to be heard. See, e.g. *Sarisohn, supra,* 265 F.Supp. at 458.

■ An additional factor causes us to adopt an even more precise definition of the "for cause" standard, as defined in *McCallister, supra,* in the context of a statute authorizing the removal of political officials. Political officials obviously make a number of political decisions, the wisdom of which depends upon one's political perspective. Elected political officials are answerable to their constituents for such decisions, either at regularly scheduled elections or special recall votes. § 77.650. City councils should not subvert the electorate's will by impeaching mayors for purely political reasons. Therefore, the appropriate meaning of the "for cause" standard for impeachment of the elected Mayor here should not only "specifically [relate] to and [affect] the administration of [his] office, and ... be ... of a substantial nature directly affecting the rights and interests of the public," *McCallister, supra,* 422 S.W.2d at 657; it should also be limited to objective reasons which reasonable people, regardless of their political persuasion, could agree would render any mayor's performance ineffective. Such cause would include acts of misfeasance, the improper

performance of some act which may lawfully be done, malfeasance, the commission of some act wholly beyond actor's authority, and nonfeasance, the failure to perform a required duty. *See, State ex rel. Powell v. Wallace,* 718 S.W.2d 545, 549 (Mo.App. 1986) and *Wolf, supra,* 710 S.W.2d at 304–05.

The Mayor next argues that even if § 77.340 is not unconstitutionally vague, the bill of impeachment on which he was tried was so indefinite it violated the notice required by procedural due process. We disagree.

■ Impeachments of third class city mayors are regarded as administrative proceedings, which do not require that charges be levied with the precision of a criminal indictment or information. *Wallace,* 718 S.W.2d at 548 (Mo.App.1986). A bill of impeachment which fairly apprises the charged party of the factual allegations for which his removal from office is sought is sufficiently precise to satisfy constitutional requirements. *Id.*

■ This Court in *Wallace* held the mayor impeached in that case was given sufficient notice by charges that he failed to manage the police department competently, misled the city council and the media about the extent of the city's fiscal problems, and lacked the administrative ability to perform his public duties. All nine charges in the bill of impeachment in the present case, are much more specific: each allegation refers to specific acts or omissions allegedly committed by the Mayor on specific dates. *See Appendix.* The Mayor was thus adequately apprised of the factual reasons for which his removal was sought.

The Mayor also contends that he was deprived of procedural due process because the City Council, sitting as a Board of Impeachment, refused to compel the City to respond to the Mayor's interrogatories and request for production of documents. We disagree.

■ The only statutorily authorized means of discovery in an administrative proceeding, such as the impeachment of a public official, are depositions, § 536.073,

subpoenas and subpoenas duces tecum. § 536.077; *Bland v. City of Trenton,* 618 S.W.2d 438, 443 (Mo.App.1981). Methods of discovery not specifically permitted by statute are excluded; therefore, neither discovery of documents by request or motion, *Id.; Macchi v. Whaley,* 586 S.W.2d 70, 75 (Mo.App.1979), nor interrogatories, *National Advertising Co. v. State Highway Commission,* 549 S.W.2d 536, 541 (Mo.App. 1977), are allowed.

■ A 1985 amendment to § 536.073 underscores our General Assembly's intent to restrict discovery techniques in administrative proceedings. Prior to 1985, § 536.073 consisted solely of the paragraph which now constitutes § 536.073.1. Section 536.073.1 provides in pertinent part that:

> in any contested case before an agency ..., any party may take and use depositions in the same manner, upon and under the same conditions, and upon the same notice, as is or may hereafter be provided for with respect to the taking and using of depositions in civil actions in the circuit court ...

A second subsection was added to the Statute in 1985. The new subsection, in pertinent part, provides

> in addition to the powers granted in subsection 1 *and when a hearing is provided for by Chapter 621, RSMo* [which concerns hearings before the Administrative Hearing Commission]: (1) Any party may obtain discovery in the same manner, upon and under the same conditions and upon the same notice and other requirements, as is or may hereafter be provided for with respect to discovery in civil actions by rule of the supreme court of Missouri for use in the circuit court.... § 536.073.2 (emphasis added).

Our General Assembly's deliberate decision to permit the full range of civil discovery methods only in hearings before the Administrative Hearing Commission reinforces the continuing validity of the proposition that discovery in hearings conducted pursuant to Chapter 536, the Administrative Procedure Act (APA), is limited to methods specifically authorized by that Act. The APA thus did not require the City to com-

**58**

pel responses to the Mayor's interrogatories and request for production of documents.

If the APA does so restrict discovery, the Mayor contends that § 536.073 of the Act constitutes a deprivation of procedural due process. This issue was not properly preserved.

■ The constitutionality of a statute is within the permissible scope of judicial review of an administrative decision. § 536.140.2(1). A state legislature may not conclusively determine the amount of process due in connection with the deprivation of a property right or liberty interest created by state law. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985).

■ However, there are four mandatory prerequisites to preserving a constitutional issue for review after an administrative decision. The party challenging the constitutionality of a statute or ordinance must " '1.... raise the constitutional question at his first available opportunity; 2.... designate specifically the constitutional provision claimed to have been violated, such as by explicit reference to the Article and Section or by quotation of the provision itself; 3.... state the facts showing such violation; [and] 4.... preserve the constitutional question throughout for appellate review.' " *Perez v. Webb,* 533 S.W.2d 650, 655 (Mo.App.1976).

■ The Mayor's first meaningful opportunity to challenge the constitutionality of the APA restriction of discovery techniques was in his petition for judicial review. Subject to exceptions not applicable here, judicial review of an administrative decision is conducted "upon the petition and record filed." Section 536.140.1. Circuit and appellate court review of administrative decisions is therefore limited to matters raised in the petition for review.

The Mayor did not clearly challenge the constitutionality of § 536.073 in his petition for review. In that petition, the Mayor referred to the Board of Impeachment's failure to compel answers to his interrogatories and to compel the production of the documents only in a paragraph which invoked a smorgasbord of legal grounds:

"... the actions and decisions of the Board of Impeachment and City Council were in violation of the Due Process and Equal Protection Clauses of the Constitution of the United States (U.S.C.A. Const. Amnd. 5, 14), in excess of the statutory authority and jurisdiction of said Boards, not supported by competent and substantial evidence upon the record as a whole, unauthorized by law, against the weight of the evidence, arbitrary, capricious, unreasonable, based upon unlawful procedure, made without a fiar (sic) trial, involved an abuse of discretion, against the weight of the evidence and did not constitute grounds for impeachment ..."

The petition did not specify which of these legal grounds was the basis for the Mayor's claim that the Board of Impeachment's refusal to compel the requested discovery was improper. The Mayor therefore has not adequately preserved for judicial review his attack upon the constitutionality of § 536.073. Moreover, the Mayor has not cited any authority or otherwise developed his challenge to the constitutionality of § 536.073 beyond a conclusory allegation in his brief to this Court. *E.g., Boswell v. Steel Haulers, Inc.,* 670 S.W.2d 906, 912 (Mo.App.1984). Furthermore, he has not included copies of his interrogatories and document production request in his Legal File on appeal. Based on this record, we cannot find that § 536.073 failed to provide sufficient process to protect the Mayor's property right in his office.

The Mayor also argues that he was deprived of procedural due process because several of the councilmen who sat on the Board of Impeachment were not impartial. Prior to the introduction of evidence at the impeachment hearing, the Mayor filed motions to have four of the eight members of the City Council disqualified for bias against him. One challenged councilman voluntarily removed himself from the Board of Impeachment. The remaining seven councilmen voted not to remove any of the other three councilmen challenged

for bias; the vote in all three cases was 6–0, with the challenged councilman abstaining.

 The procedural due process requirement of fair trials by fair tribunals applies to administrative agencies acting in an adjudicative capacity. *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, 723 (1975). Administrative decisionmakers must therefore be impartial. *Id.* "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Id.*

 Administrative decisionmakers are expected to have preconceived notions concerning policy issues within the scope of their agency's expertise. *Hortonville Joint School Dist. No. 1 v. Hortonville Education Assoc.,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1, 9 (1976). Familiarity with the adjudicative facts of a particular case, even to the point of having reached a tentative conclusion prior to the hearing, does not necessarily disqualify an administrative decisionmaker, *Wilson v. Lincoln Redevelopment Corp.,* 488 F.2d 339, 342–43 (8th Cir.1973), "in the absence of a showing that [the decisionmaker] is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Hortonville Joint School District,* 96 S.Ct. at 2314. Conversely, any administrative decisionmaker who has made an unalterable prejudgment of operative adjudicative facts is considered biased. Because of the risk that a biased decisionmaker may influence other, impartial adjudicators, the participation of such a decisionmaker in an administrative hearing generally violates due process, even if his vote is not essential to the administrative decision. *State ex rel. Brown v. City of O'Fallon,* 728 S.W.2d 595, 598 (Mo.App. 1987).

 To evaluate the evidence of bias properly, we must first determine the appropriate standard for our review. We normally presume the correctness of the decision by a city council sitting as a board of impeachment and uphold that decision if it is supported by competent and substantial evidence, which we view in the light most favorable to the council's determination, disregarding all contrary evidence. *Wallace, supra,* 718 S.W.2d at 548. A party challenging the impartiality of councilmen sitting on a board of impeachment "must first overcome the presumption in favor of the honesty and integrity of those serving as adjudicators." *Id.*

Concededly, all three councilmen whom the Board of Impeachment declined to disqualify for bias insisted that they had formed no opinion concerning whether the Mayor should be removed and that they could set aside their personal feelings toward the Mayor and their previously expressed views regarding various allegations in the bill of impeachment. This testimony of these councilmen, however, cannot constitute substantial evidence of their impartiality.

 Neither law nor logic warrants permitting administrative decisionmakers conclusively to establish their own impartiality simply by testifying to that effect. Our normal standard for reviewing administrative decisions reflects deference to administrative agencies' expertise. However, administrative decisionmakers are no more expert at determining their impartiality than judges are at determining theirs. Since § 77.340 places city council members in the position of judges, making findings of fact and conclusions of law, the council members' determination of the existence of their impartiality should be reviewed using the same standard used to review a judge's determination of his or her challenged impartiality.

A trial judge must consider challenges to the judge's impartiality on the whole record, and not solely on the basis of the judge's conviction of his own impartiality. *In re Marriage of Burroughs,* 691 S.W.2d 470, 474 (Mo.App.1985). The relevant inquiry is whether "a reasonable person would have factual grounds to doubt [the judge's] impartiality." *Id.* A trial judge's determination of his or her alleged bias is reviewed for abuse of discretion. *Id.* We

use this abuse of discretion standard for our review here.

The three councilmen whom the Mayor sought to disqualify may have expressed prejudgments of adjudicative facts. But, for our purposes here, we shall assume they did not. However, even when administrative decisionmakers have expressed no prejudgment concerning adjudicative facts, "experience teaches that the probability of actual bias on the part of the ... decisionmaker is too high to be constitutionally tolerable [in situations] including ... [those] ... in which the adjudicator ... has been the target of personal abuse or criticism from the party before him." *Withrow, supra,* 95 S.Ct. at 1464.

A contentious atmosphere can be expected in many administrative hearings. Therefore, "an [adjudicator's] attitude closely bordering on partisanship or even hostility [as reflected in exchanges between the adjudicator and the charged party at the hearing] does not in and of itself prove that the decisionmaker was biased." *Tele-Trip Co. v. National Labor Relations Board,* 340 F.2d 575, 581 (4th Cir.1965). But, vituperative criticism of an adjudicator by a charged party prior to the filing of administrative charges may present an unacceptably high risk of creating bias on the part of the adjudicator.

In the present case, all three councilmen challenged for bias had been the object of pointed personal criticism from the Mayor. In a letter to the St. Louis County Prosecuting Attorney, the Mayor accused all three councilmen of unethical behavior, including the following allegations: one Councilman had a conflict of interest because he served on a council committee which wrote the City's solid waste ordinance at the same time that he formed an infectious waste hauling business; the same Councilman resisted arrest when stopped on suspicion of driving while intoxicated; the letter implied that another challenged Councilman attempted to have a speeding ticket issued to his brother "fixed"; the third Councilman challenged for bias had a conflict of interest when he worked for the City's health insurance

carrier while serving as both City Treasurer and councilman. The Mayor had even requested one Councilman's resignation because of the councilman's alleged ticket-fixing. These councilmen's protestations of impartiality notwithstanding, the foregoing evidence, we believe, would lead reasonable people, willing to presume the councilmen's integrity, to question the councilmen's impartiality at the impeachment proceedings. The appearance of bias created by this evidence should have been avoided if possible.

■ However, disqualifying the three challenged councilmen would have disabled the Board of Impeachment, which could only act upon the vote of two-thirds, or six, of its eight elected members. § 77.340. Due process considerations do not require a biased administrative agency to forego making a decision which no other entity is authorized to make. Under such circumstances, the so-called *Rule of Necessity* permits an adjudicative body to proceed in spite of its possible bias or self-interest. *Wallace, supra,* 718 S.W.2d at 548.

The Mayor contends the *Rule of Necessity* is unconstitutional. We disagree. Both the United States Supreme Court and our courts have recently traced the long lineage of the *Rule* and emphatically reasserted its validity. *U.S. v. Will,* 449 U.S. 200, 214–16, 101 S.Ct. 471, 480–81, 66 L.Ed.2d 392, 405–06 (1980); *Barker v. Secretary of State's Office,* 752 S.W.2d 437, 440–41 (Mo. App.1988).

■ The Mayor also argues that the *Rule of Necessity* did not prevent the disqualification of at least one of the challenged councilmen. The Mayor is correct. The necessary six council members would have been available to vote on impeachment if only one councilman had been disqualified. Citing *Brown, supra,* 728 S.W.2d at 598, the mayor contends that this error was prejudicial. We disagree.

In *Brown,* the *Rule of Necessity* did not require the participation of either of the only two members of the board of alderman who were challenged for bias. Removal of the two allegedly biased aldermen could thus have resulted in a totally impar-

tial Board of Impeachment in that case. In the present case, however, the *Rule of Necessity* required the participation of at least two of the three Councilmen whom the Mayor challenged for bias. There was only harmless error in allowing all three councilmen to serve on the Board of Impeachment, rather than only the two councilmen whose participation was required by the *Rule of Necessity*.

■ The Mayor next argues that we should at least adjust our standard of review to reflect the fact that some members of the Board of Impeachment were biased. We agree. .

It makes no sense to show the extreme deference of viewing the evidence in the light most favorable to an administrative body which is not completely impartial. In *Barker, supra,* the Court adopted the suggestion made in 3 Davis, Administrative Law Treatise, § 19.9 (2d Ed.1980), that

'... ways can sometimes be found to relieve against the injustice [of permitting a biased administrative decision]. Whenever the rule of necessity is invoked and the administrative decision is reviewable, the reviewing court, without altering the law about scope of review, may and probably should review with special intensity.'

752 S.W.2d at 441.

As the *Barker* Court stressed, our review is not de novo. *Id.* We do not substitute our judgment for that of the administrative agency, which, though biased, retains expertise for which we should show some respect. Our standard of review should therefore be deferential, but it should also compensate for the possibility that bias may have tainted the agency's exercise of its expertise. Accordingly, the decision of a biased administrative agency acting under the *Rule of Necessity* should be upheld if the evidence presented at the administrative hearing would have entitled an objective decisionmaker to reach the same conclusion. We use this standard to review the Mayor's final contention, which is that, constitutional considerations aside, he committed no impeachable offense.

As indicated earlier, determination of whether "cause" for impeachment exists must be made on a case by case basis. *Wolf,* 710 S.W.2d at 303. Even when a mayor is impeached for several, independent acts, any one of the allegations, if supported by competent and substantial evidence, may be sufficient to sustain the Mayor's removal. *Powell, supra,* 718 S.W.2d at 549. We consider two of the charges.

In Allegation No. 1 of the Bill of Impeachment, the Mayor was accused of violating § 77.100 by refusing to disclose to the City Council and the City Attorney the mayor's knowledge regarding a wrongful discharge suit which, pursuant to 42 U.S.C. § 1983, two former Maryland Heights Police Commissioners had filed against the City, the Mayor, and individual councilmen. After numerous informal requests to the Mayor for him to indicate what his testimony would be at trial, the Council had the Mayor served with an order to make such disclosure. The Mayor refused, and the Board of Impeachment concluded that this refusal to obey the Council's order constituted cause for the Mayor's removal. We agree.

■ Section 77.100 authorizes the city council of a third class city to "compel the attendance of witnesses and the production of papers relating to any subject under consideration in which the interest of the city is involved ..." The Mayor correctly observes that the statute literally requires only the attendance of witnesses, and not their testimony. However, the mere appearance of witnesses before a city council would only inconvenience the witnesses, without providing any useful information to the council. Therefore, the only sensible interpretation of this statute is that city councils have the power to compel non-privileged statements from summoned witnesses.

■ The Mayor argues that he had no obligation to obey the City Council's order because the Council did not comply with § 610.020.1 of the "Sunshine Act." This section requires governmental bodies to "give notice of the time, date, and place of

each meeting, and its tentative agenda, in a manner reasonably calculated to apprise the public of that information." This argument is misdirected and, thus, misses the mark.

Any failure of the City Council to comply with the requirement of notice of a tentative agenda did not excuse the Mayor's disregard of the Council's order that he appear and disclose what his testimony would be in the lawsuit filed by the two former police commissioners. Section 610.-020 is intended to provide the public a reasonable opportunity to attend meetings of governmental bodies. The Mayor was in attendance at the Council meeting at which his testimony was sought.

■ We also reject the Mayor's contention that he was prohibited by a city ordinance from divulging the information sought by the City Council. Rule 7 of § 2–43 of the Maryland Heights Municipal Code provides that "any person in attendance at an executive session is honor-bound not to violate the confidentiality of the discussion taking place during the session, except as to any portions thereof which may clearly transgress the Sunshine Act. [RSMo 610.010 et seq.]" The minutes of the City Council meeting at which the Mayor's statement was formally requested show that the Council had previously solicited the Mayor's planned testimony. The City Attorney testified that the Mayor had "made it obvious that he wasn't going to participate in an executive session discussion of his testimony." The Mayor certainly would have violated no confidence by disclosing in a subsequent executive session information received at an earlier executive session of the City Council. Therefore, the city ordinance did not excuse the Mayor's disobedience of the City Council's order to reveal his planned testimony.

■ The Mayor's violation of his duty, under § 77.100, to disclose his planned testimony to the City Council constituted non-feasance, the failure to perform a required duty. This is inexcusable in any mayor, regardless of political considerations. Ignorance of what the Mayor's testimony at trial would be adversely affected the City's trial preparation. The precise extent of the inconvenience which the City experienced as a result of not knowing how the Mayor would testify is disputed. However, the Mayor's violation of § 77.100 in and of itself constituted an impeachable offense, regardless of its consequences and independent of the other grounds on which the mayor was impeached.

■ Also, Count 5 of the Bill of Impeachment charged the Mayor with violating his oath of office by circumventing the City Police Chief's efforts to enforce § 572.030, RSMo. 1986, which prohibits the promotion of gambling. The Board of Impeachment decided that the Mayor's conduct in this matter constituted a separate cause for his removal. We agree.

The Mayor's oath of office required him to support "the provisions of all laws of [Missouri] affecting Cities of the Third Class...." We construe this oath as obligating the Mayor to enforce state statutes in a reasonable manner. A method of enforcement which tends to undermine police authority is obviously unreasonable.

The games in question occurred at a "fun fair" sponsored by the Maryland Heights Athletic Association. The City's Police Chief informed the Association president that certain games had to be discontinued because they involved illegal gambling.[3] The games were shut down, and the Police Chief so informed the Mayor. Shortly thereafter, the Mayor told the Association's president that the games could be reopened. The Police Chief did not know of the Mayor's intervention until the following afternoon, at which time the Chief again ordered the games to be closed.

---

**3.** Section 572.010(4) states: "... a person engages in 'gambling' when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome...." The City Attorney testified that the games at issue constituted illegal gambling. On appeal, the Mayor does not dispute that there was illegal gambling at the fair.

Regardless of the propriety of suspending enforcement of § 572.030 for the day of the fair, the manner in which the Mayor arranged for the non-enforcement of that statute was unreasonable and, thus, improper. Rather than supporting state statutes, as he had taken an oath to do, the Mayor undermined respect and support for the law by telling a private citizen to disregard orders from the City's Chief of Police. This was an impeachable offense.

Judgment affirmed.

SMITH and GRIMM, JJ., concur.

### APPENDIX

### BILL OF IMPEACHMENT

TO: LARRY D. FITZGERALD, MAYOR OF THE CITY OF MARYLAND HEIGHTS, MISSOURI

Pursuant to Missouri Revised Statutes, § 77.340, and other applicable statutes, you are hereby notified that, as the charged party, you shall be the subject of impeachment proceedings to determine whether or not you should and/or shall be removed from the office of Mayor of the City of Maryland Heights, Missouri (hereafter "City").

Said impeachment proceedings, based upon the below stated nine numbered charges, shall be commenced on Tuesday evening, September 6, 1988, commencing at 7:00 p.m. at the Maryland Heights City Hall, 212 Millwell Drive, Maryland Heights, Missouri 63043, or at such later date and time as may be necessary. Said impeachment proceedings shall continue from time to time thereafter until completed.

1. On or about May 19, 1988, and contrary to Missouri Revised Statutes, § 77.100, and other applicable state statutes, you refused to cooperate with the City Council and the City Attorney by refusing to disclose your knowledge of and intended testimony as to the factual circumstances relative to the claims of plaintiffs and the defense of defendants in the matter of *State of Missouri, ex rel., Ruiz, et al. v. Lynch, et al.*, being cause number 546126 in the St. Louis County Circuit Court. Your refusal necessitated the retention by City of additional counsel to represent defendants in said cause, at much expense, inconvenience and jeopardy to the City.

2. On or about May 11, 1988, you signed as Mayor of the City, a letter addressed to the offices of the St. Louis County Prosecuting Attorney. Regardless of the truth or falsity of the allegations therein, said letter was contrary to the letter and intent of City Ordinance No. 132, Missouri Revised Statutes, § 77.350, and other applicable City ordinances, state statutes, and/or City's personnel policies and procedures. Said letter unnecessarily and/or recklessly exposed the City to liability, claims, and suit by those individuals accused of wrongdoings in said letter. Without proper authority, you signed said letter in your position as Mayor of the City.

3. On or about May 9, 1988, you filed an appeal with the Waste Management Commission of St. Louis County, Missouri, relative to proceedings involving the BFI of St. Louis, Inc.'s landfill within the City's boundaries. In this regard, you used City letterhead and signed the same as Mayor; all without proper authority and contrary to the express decision of the City Council not to participate in said proceedings. Said appeal was also contrary to the express advice of the City Attorney and jeopardized the City's rights relative to said landfill. Your appeal publicly misrepresented the position and desire of the City in said proceedings.

4. On or about June 16, 1988, you violated Missouri Revised Statutes, §§ 77.250 and 105.454(3), as well as customary and usual ethical conduct by your veto of City Bill 446, City Ordinance No. 88–420, although having a personal interest in the outcome of the legislation then under consideration.

5. During or about June, 1987, you violated your oath of office and Missouri Revised Statutes, by circumventing efforts of the City's Chief of Police to enforce the gaming and gambling laws of the State of Missouri.

6. During or about November, 1987, you violated your oath of office and Missouri Revised Statutes, § 77.350 by directing the City's Chief of Police not to enforce City Ordinance No. 86–216.

7. On or about May 27, 1988, you violated City Ordinance No. 132, other City Ordinances, and/or City personnel policies and procedures by your letter addressed to all City Police Department personnel.

8. On or about December 24, 1986, and December 31, 1986, by letters addressed to City's Chief of Police, you ordered said Chief personally to reimburse the City for purported missing funds, without any authority or just cause for such order.

9. During or about January, 1988, you ordered the City's Police Department personnel to arrest Mark Comfort, without probable cause or good reason, contrary to the reasoned and experienced opinion of said City's Police Department personnel. Further, you wrongfully and unjustly caused a memo of insubordination to be placed in the personnel file of City's Chief of Police for his attempt to act lawfully and reasonably in this matter.

_____
Councilperson

_____
Councilperson

_____
Councilperson

_____
Councilperson

_____
Councilperson

_____
Councilperson

_____
Councilperson

_____
Councilperson
Dated: July 21, 1988