**STATE of Missouri, Respondent,**

v.

**Brenda STONE, Appellant.**

**No. WD 51266.**

Missouri Court of Appeals,
Western District.

July 23, 1996.

Elizabeth P. McMillin, Jefferson City, for appellant.

Mark Tracy, Fulton, for respondent.

Before ULRICH, P.J., and BRECKENRIDGE and EDWIN H. SMITH, JJ.

BRECKENRIDGE, Judge.

Brenda Stone was convicted by a jury of illegal possession of wildlife, § 252.040, RSMo 1994, after she failed to construct a pen of sufficient strength to prevent the escape of her three mountain lions. The trial court entered judgment per the verdict and fined Ms. Stone fifty dollars. She appeals, contending that § 252.040 and its corresponding regulation, 3 CSR 10–9.220, 1994, are unconstitutionally vague and that the evidence is insufficient to support the judgment.

The judgment is affirmed.

In reviewing the sufficiency of the evidence, this court views the evidence and reasonable inferences therefrom in a light most favorable to the judgment, disregarding all contrary evidence. *State v. Hill,* 812 S.W.2d 204, 207 (Mo.App.1991). The judgment will be affirmed if there is substantial evidence from which a jury could 'conclude that the defendant is guilty beyond a reasonable doubt.' *State v. Neal,* 849 S.W.2d 250, 253 (Mo.App.1993).

Prior to February, 24, 1994, Ms. Stone possessed three mountain lions at her home in Callaway County, Missouri. On January 4, 1994, John Griffen and Mike Bethall, agents from the Missouri Department of Conservation, went to the home of Ms. Stone to inspect the pen in which the mountain lions were kept.

The pen had an outside area enclosed with a chain link fence and an adjoining area which occupied part of an old trailer. There was a twelve-foot-long barrier separating the inside portion of the pen from the rest of the trailer. The middle four feet of the barrier consisted of a door made of "cattle panel" and wire, with the remaining portion fashioned from plywood.

The agents determined that this barrier was inadequate and that the pen had several other deficiencies, including a trap door

which was not functional [1], a window covered by only a low gauge of wire, and a roof on the outside enclosure which was "sagging down into the pen quite a ways."

The agents informed Ms. Stone that, due to these deficiencies, the pen did not comply with the requirements of 3 CSR 10–9.220 of the Missouri Wildlife Code. After reading the regulation to her and giving her a copy of the Wildlife Code, the agents outlined the improvements she needed to make to the pen. Specifically, they told her to put stronger wire on the window, construct a frame around the wire on the inside door of the pen, finish the trap door, and connect support bars to the outside enclosure to raise and support its roof.

The agents also informed Ms. Stone that, effective January 31, 1994, all pens were required to have a "secondary barrier to prevent unauthorized entry or direct physical contact by the public." Both the agents and Ms. Stone agreed that an electrical fence surrounding the pen would satisfy this requirement. The agents gave Ms. Stone forty-five days to make the necessary changes but told her that if she needed more time, she should contact them. Ms. Stone indicated that she understood the regulation and believed forty-five days "would be plenty of time" to make the changes.

At 1:00 p.m. on February 24, 1994, the agents returned to Ms. Stone's house to reinspect the pen. Rather than make the changes specified by the agents, Ms. Stone had allowed the condition of the pen to deteriorate. The wire covering the window had been pulled down, leaving only a pane of glass separating the mountain lions from the outside. The wire on the barrier inside the trailer had been bent back, creating a large gap which allowed the mountain lions to put their heads and legs outside of the pen. During the agents' inspection, one of the mountain lions stuck its head outside the pen and began to chew on a wire which held the door to the pen in place.

Ms. Stone had also failed to fix the trap door, build an electrical fence, or construct a frame around the wire on the door to the pen. Although braces had been put across the outside enclosure, they were not attached to the sides of the pen.

The agents informed Ms. Stone that the pen was not in compliance with the regulations and asked her why she had failed to make any improvement to the pen. Ms. Stone replied that she had not had time to make any changes during the past month-and-a-half, because "some guys [were] supposed to come put a water line in and they hadn't shown up," and she "had had a lot of trouble with her dogs." She explained that one of her dogs had "gotten out" and a mountain lion had "reached through, grabbed and killed the dog." She had not contacted the agents to ask for additional time, however. The agents decided to discuss the situation with their supervisor, and told Ms. Stone that they would return in a few hours.

After the agents explained the situation to their supervisor, he told them to seize the cats. The agents obtained a warrant to do so, and returned to Ms. Stone's house that evening. During the agents' absence, Ms. Stone had attempted to fix several of the pen's defects. She put another door inside the trailer, increased the height of several wood panels attached to the trailer's floor, covered the window in the trailer with cattle panel and wire, and erected an electrical fence.

Even though Ms. Stone had improved the strength of the pen, it still had several deficiencies. The electrical fence, although erected, had not been connected to an electrical cord. The door to the pen was still of insufficient strength, in that it could "flop back and forth about six to eight inches." A cable securing the door came loose while an agent was pulling on it, allowing a lion to stick his paw out of the hole and swing it at the agents.

Because the pen remained in a deficient condition, the agents decided to exercise the warrant. With the help of several law enforcement officers, they removed the moun-

---

1. Pens must "be constructed with a den, nest box or connected housing unit that can be closed off and locked with the animal inside, or be a divided cage with a door between the compartments to allow servicing and cleaning." 3 CSR 10–9.220.

tain lions from the pen. While they were doing so, one of the officers fell through the floor of the trailer, leaving a hole some thirty-two inches in width. Several officers testified that the floor of the pen was weak and "spongy."

At trial, Steve Bircher, an employee of the St. Louis Zoo, testified that mountain lions are "very strong" animals with the ability to leap fifteen feet vertically and twenty feet horizontally. After examining photos of Ms. Stone's pen, Mr. Bircher stated that he felt the pen was insufficient to contain a mountain lion.

■■■ Ms. Stone's first point contends that § 252.040 and 3 CSR 10–9.220 are unconstitutionally vague.[2] A preliminary issue is whether this court has jurisdiction to consider the constitutional challenge. Under Article V, § 3 of the Missouri Constitution, the court of appeals does not have jurisdiction of a case involving the constitutional validity of a statute. *State v. Roedel*, 884 S.W.2d 106, 108 (Mo.App.1994). The appellant's assertion of a constitutional issue deprives this court of jurisdiction, however, only if the constitutional issue is real and substantial rather than merely colorable. *State v. Prowell*, 834 S.W.2d 852, 854 (Mo. App.1992). A constitutional claim is:

> substantial when, upon preliminary inquiry, the contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy; but, if such preliminary inquiry discloses the contention is so obviously unsubstantial and insufficient, either in fact or law, as to be plainly without merit and a mere pretense, the claim may be deemed merely colorable.

*Matter of Estate of Potashnick*, 841 S.W.2d 714, 718 (Mo.App.1992) (*quoting Kansas City Star Co. v. Shields*, 771 S.W.2d 101, 103 (Mo.App.1989)). Because we determine that Ms. Stone's constitutional challenge is merely colorable, this court has jurisdiction.

Section 252.040 states, in pertinent part:

No wildlife shall be pursued, taken, killed, possessed or disposed of except in the manner, to the extent and at the time or times permitted by such rules and regulations; and any pursuit, taking, killing, possession or disposition thereof, except as permitted by such rules and regulations, are hereby prohibited.

Regulation 3 CSR 10–9.220, entitled "Wildlife Confinement Standards," sets the standard for pens holding mountain lions, which are classified as Class II wildlife. It reads, in relevant part:

(1) Cages, pens or other enclosures for confining wild animals shall be well braced, securely fastened to the floor or ground, covered with a top as required and constructed with material of sufficient strength to prevent escape, and shall meet the specifications listed in this rule. Animals must be confined at all times in cages, pens or enclosures except in lead or drag races. Except for unweaned young, Class II wildlife may not roam freely anywhere within a residence or inhabited dwelling.

(2) Cages, pens or other enclosures for confining Class II wildlife must have a secondary barrier to prevent unauthorized entry or direct physical contact by the public. Doors shall remain locked at all times with appropriate locks and chains. Enclosures shall be constructed with a den, nest box or connected housing unit that can be closed off and locked with the animal inside, or be a divided cage with a door between the compartments to allow servicing and cleaning. The enclosure mesh size or spacing of bars shall be sufficient to prevent escape. A barrier system of wet or dry moats or structures, as approved by the American Association of Zoological Parks and Aquariums, will meet these requirements. Restraint by tethering only is prohibited for Class II animals, except for elephants within a perimeter fence or trained elephants under the immediate supervision of a qualified trainer or handler.

---

**2.** Duly promulgated state regulations have the force and effect of law, *Killion v. Bank Midwest, N.A.*, 886 S.W.2d 29, 32 (Mo.App.1994), and can be subject to challenges of unconstitutional vagueness. *See Harris v. Missouri Dept. of Conservation*, 895 S.W.2d 66, 70–71 (Mo.App.1995).

(A) Class II animals shall be confined in cages, pens, enclosures or in buildings of sufficient strength with restraints affixed to all windows, doors or other means of entry or exit.

Courts presume a statute to be constitutional, holding otherwise only if the statute plainly contravenes some constitutional provision. *Prokopf v. Whaley,* 592 S.W.2d 819, 824 (Mo. banc 1980). A statute which fails to clearly define proscribed conduct violates the Due Process Clause and is void for vagueness. *State v. Allen,* 905 S.W.2d 874, 876 (Mo. banc 1995). Vagueness challenges take two forms. *State v. Young,* 695 S.W.2d 882, 884 (Mo. banc 1985). A statute is unconstitutionally vague if it fails to give "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Allen,* 905 S.W.2d at 877 (*quoting U.S. v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954)). A statute is also vague if its standards lack sufficient specificity to prevent arbitrary and discriminatory enforcement. *Allen,* 905 S.W.2d at 877.

In determining whether terms are impermissibly vague, "neither absolute certainty nor impossible standards of specificity are required...." *State v. Duggar,* 806 S.W.2d 407, 408 (Mo. banc 1991). Rather, the test is "whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Id.* (*quoting State v. Crawford,* 478 S.W.2d 314, 317 (Mo. 1972)). Where the words used are of common usage and understandable to persons of ordinary intelligence, they satisfy the constitutional requirement of definiteness and certainty. *Whaley,* 592 S.W.2d at 824. The statute is void only if its terms are of so uncertain meaning or so confused that courts cannot discern them with reasonable certainty. *Id.* If the statute is capable of any reasonable and practical construction, it will be upheld. *Duggar,* 806 S.W.2d at 408.

Ms. Stone contends that § 252.040 and 3 CSR 10–9.220 are unconstitutionally vague, because the phrase "material of sufficient strength to prevent escape," is "completely subjective," forcing persons of common intelligence to guess at its meaning. She argues that the phrase may have different interpretations, depending upon the breed of animal involved.

Although the requirement that pens have "material of sufficient strength to prevent escape" may vary from one breed of animal to another, that alone does not make the regulation unconstitutionally vague. "Language which reasonable people can understand is not impermissibly vague merely because it requires interpretation on a case-by-case basis." *Fitzgerald v. City of Maryland Heights,* 796 S.W.2d 52, 55 (Mo.App.1990). Thus, Missouri courts have upheld a statute which authorizes the impeachment of a mayor "for cause shown," *id.* at 56, and one which requires a principal to take "reasonable precautionary measures to prevent accidents." *Bell v. Bd. of Educ. of City of St. Louis,* 711 S.W.2d 950, 953–54 (Mo.App. 1986). The phrase "material of sufficient strength to prevent escape" contains terms of common usage and is understandable to persons of common intelligence. Because § 252.040 and 3 CSR 10–9.220 sufficiently delineate their limits in words of common understanding, they are not impermissibly vague.

Ms. Stone further argues that § 252.040 and 3 CSR 10–9.220 lack explicit standards for their enforcement, leading to arbitrary and discriminatory application by Missouri conservation agents. Ms. Stone alleges that "what is considered a violation could change day by day or from one agent's interpretation to another's arbitrarily, leaving potential offenders unknowingly at the mercy of the police, prosecutors, judges and jurors."

Ms. Stone has failed to show that § 252.040 and 3 CSR 10–9.220 are unconstitutionally vague as applied to her own conduct. Ms. Stone specifically discussed with Agents Griffen and Bethall in early January what she needed to do in order to fix the mountain lions' pen. When the agents returned on February 24, 1994, Ms. Stone had not only failed to make these specific adjustments, she had allowed the condition of the pen to deteriorate.

Regulation 3 CSR 10–9.220 utilizes terms of common understanding and its meaning is

clear, in requiring that: "(1) Cages, pens or other enclosures for confining wild animals shall be well braced, ... covered with a top as required and constructed with material of sufficient strength to prevent escape ...; (2) Cages, pens or other enclosures for confining Class II wildlife must have a secondary barrier.... Enclosures shall be constructed with a ... connected housing unit that can be closed off and locked ... to allow servicing and cleaning; and (A) Class II animals shall be confined in cages, pens, enclosures or in buildings of sufficient strength with restraints affixed to all windows, doors or other means of entry or exit." Here, the support bars for the roof of the outside enclosure were not "well braced," as the bars were not attached to the sides of the pen. Ms. Stone had failed to build the secondary barrier or construct a frame around the wire on the inside door of the pen. The trap door was not functioning, so there was no way to close off and lock the mountain lions in or out of the trailer to permit servicing and cleaning. In addition, not only had Ms. Stone failed to put stronger wire on the trailer window, the existing wire had been pulled down from the window, and the wire on the barrier inside the trailer had been bent back to the extent that the mountain lions could put their paws and heads outside the pen. Section 252.040 and 3 CSR 10–9.220 were not unconstitutionally vague as applied to Ms. Stone's conduct. Point denied.

■ Ms. Stone's second and final point challenges the sufficiency of the evidence to support the judgment. Specifically, Ms. Stone contends there was no evidence presented as to what a Class II wildlife pen should be constructed of to prevent escape, nor was there any evidence her mountain lions had escaped or could escape from the pen. In addition, Ms. Stone contends there was no evidence that she knew the pen was constructed with insufficient material to prevent escape.

The evidence established that when Agents Griffen and Bethall first arrived at Ms. Stone's home on the afternoon of February 24, 1994, the pen lacked several features which were required by 3 CSR 10–9.220. As discussed in point one, the pen did not have

"restraints affixed to all windows," because the wire covering the trailer window had been pulled down. The pen also lacked a "secondary barrier," and was not "well braced" in that the support bars for the roof of the outside enclosure were not attached to the sides of the pen. There was also a large gap in the barrier inside the trailer, allowing the lions to put their paws and heads outside of the pen and chew on the wire which supported a door to the pen. The state was not required to establish what would constitute the ideal pen for mountain lions. It was sufficient that the evidence showed Ms. Stone's pen to be inadequate.

Contrary to Ms. Stone's contention, these defects were not cured merely because the mountain lions had not previously escaped from the pen. A violation of the statute does not depend on whether the animals have in fact escaped; it is the potential for escape that the statute seeks to deter. Finally, Ms. Stone's belated attempt to remedy the pen's deficiencies served only to demonstrate that she knew the pen failed to conform to the standards set out by law.

There is sufficient evidence from which a jury could find Ms. Stone possessed wildlife in violation of § 252.040 and 3 CSR 10–9.220 on February 24, 1994. Ms. Stone's second point is denied.

The judgment is affirmed.

All concur.