

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION TWO</u>

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101325 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | |
| | ) | |
| RICKEY BATES, | ) | Honorable Margaret M. Neill |
| | ) | |
| Defendant/Appellant. | ) | Filed: June 16, 2015 |

<u>Introduction</u>

Rickey Bates (Appellant) appeals from the trial court's judgment entered upon a jury verdict convicting him of first-degree murder, first-degree robbery, and two counts of armed criminal action. We affirm.

<u>Factual and Procedural Background</u>

The State charged Appellant with first-degree murder, first-degree robbery, and two counts of armed criminal action involving the shooting death of Antoine Shaw (Victim). The evidence presented at trial, viewed in the light most favorable to the verdict, is as follows.

At 8:23 p.m. on March 4, 2011, police officers responding to a call of shots fired found Victim's vehicle partially on the sidewalk against a street sign with the engine running and the doors closed and locked. Victim was located in the driver's seat, dead

from several gunshot wounds to the head. Victim's pockets were turned inside out and he was holding a plastic bag of marijuana. A second bag of marijuana was found in the center console and $180 in currency was found in the glove box.

Police found four bullet holes in the driver's side door and recovered five .38 caliber bullets from the vehicle. Three bullets were identified as being fired from the same gun, while the other two were too damaged to make a comparison.

Victim had three gunshot entrance wounds on the right side of his face and exit wounds on the left side of his face. Victim also had gunshot wounds to his nose and brow. Stippling or tattooing, which occurs when a gun is fired close to the skin, was found on the right side of Victim's nose. Two .38 caliber bullets were recovered from Victim's body, one in his left scalp and the other in the cranial cavity on the left side of his skull. Victim suffered extensive skull fractures and devastating brain injuries from the gunshots, resulting in his death. The bullets recovered from Victim's body were fired from the same gun as the three matching bullets recovered from the vehicle.

Quintavian Rogers (Rogers), Appellant's cousin, testified he was friends with Victim and learned from family members that Appellant was involved in his murder. Shortly after learning of Appellant's involvement, Rogers surreptitiously recorded Appellant confessing to the crime with his cell phone while Rogers and Appellant were sitting in Rogers's car. Rogers brought the recording to the police hoping they could help Rogers's mother obtain a sentence reduction on a federal drug conviction and because Rogers believed Appellant was not remorseful for killing Victim.

During this taped conversation, Appellant described how he killed Victim and how Victim's body was positioned. Appellant said he was angry with Victim and

2

planned to rob him. Appellant said Victim gave Appellant some marijuana, and then Appellant "upped" his gun, shot Victim in the head one time, and left. Appellant returned to the car and found Victim was still breathing, so he shot him again, firing a total of five bullets. Appellant stated he shot Victim with a .38 caliber handgun.

Two weeks later, Appellant was arrested by police. After being advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), Detectives Lon Ray (Det. Ray) and Scott Sailor (Det. Sailor) conducted a recorded interview of Appellant. During this interview, Appellant denied knowing Victim or having anything to do with Victim's murder. When police played Appellant a portion of the recording taken by Rogers, Appellant told detectives that it was not him in the recording. Approximately 15 to 20 minutes later, when Det. Sailor advised Appellant he was being charged with the murder and robbery, Appellant said he wanted to tell the detectives what happened.

The detectives reactivated the camera, advised Appellant of his Miranda rights again, and conducted a second interview. Appellant told the detectives that a man named A.J. or Arkeith Hill (A.J.) contacted Victim to arrange a meeting. A.J. got into the car with Victim and tried to grab the marijuana from Victim, but Victim put A.J. in a headlock. Appellant stated he was carrying a black snubnose .38 caliber handgun that A.J. had given him and that he shot Victim in the head. Appellant took money out of the car's armrest and he and A.J. left the scene. Appellant said A.J. took the gun from Appellant, returned to the car, and shot Victim several more times. Appellant traded the gun for another after the murder.

3

Det. Ray testified that as part of their investigation he obtained Victim's cell phone records, which showed he received a phone call about an hour before his murder. Det. Ray testified further investigation revealed this call was initiated from Appellant's mother's phone and was the same number Appellant gave as an emergency contact number when he was arrested.

While awaiting trial, Appellant told one of his cellmates, Jarvis Bell (Bell), that he had a disagreement with a man over a marijuana sale. Appellant told Bell he later called this man, ostensibly to buy more marijuana, but when the man arrived for the meeting, Appellant shot him.

The jury found Appellant guilty of first-degree murder, first-degree robbery, and two counts of armed criminal action. The court sentenced Appellant to life in prison without the possibility of parole on the first-degree murder conviction and to concurrent 30-year sentences on the remaining convictions. This appeal follows.

Points Relied On

In his first point, Appellant contends the trial court erred in admitting evidence of his videotaped statements to police over defense counsel's objection because, under the totality of the circumstances, Appellant's statements were unknowing, unintelligent, and involuntarily made and the product of a coercive interrogation in which detectives knew he was 18 years old, could neither read nor write, and had a learning disability and was thereby incapable of understanding his rights under Miranda.

In his second point, Appellant argues the trial court erred in denying Appellant's motion to strike Det. Ray's testimony, or in the alternative, request for a mistrial after Det. Ray testified he reviewed Victim's cell phone records and determined a call was

4

made to Victim's cell phone from Appellant's mother's phone within an hour of Victim's death because the State failed to lay a proper business records foundation for admitting Det. Ray's testimony concerning information contained in the records.

In his third point, Appellant maintains the trial court plainly erred, causing a manifest injustice or miscarriage of justice, in imposing a mandatory sentence of life without the possibility of parole for a first-degree murder conviction for an offense committed when Appellant was 18 years and 11 days old, had a learning disability, and could neither read nor write because under Miller v. Alabama, 132 S.Ct. 2455 (2012) and State v. Hart, 404 S.W.3d 232 (Mo. banc 2013), the sentence violated the principle of proportionality and Appellant's constitutional rights to due process of law and protections against cruel and unusual punishments.

## Discussion

### Point I - Motion to Suppress Statements

Upon a defendant's challenge to the admissibility of a statement on the ground that it was involuntary, the State has the burden of proving the voluntariness of the statement by a preponderance of the evidence. State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc 1998). When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence. Id. We give deference to the trial court's superior opportunity to determine the credibility of the witness and to the court's factual findings and credibility determinations. Id. This Court views the facts and the reasonable inferences therefrom in the light most favorable to the court's decision. State v. Kelly, 119 S.W.3d 587, 592 (Mo. App. E.D. 2003). Questions of law are reviewed *de novo*. Rousan, 961 S.W.2d at 845. The trial court's

5

ruling on a motion to suppress evidence will be affirmed unless it is clearly erroneous. State v. Davis, 980 S.W.2d 92, 94 (Mo. App. E.D. 1998).

The 14th Amendment Due Process Clause bars involuntarily obtained confessions from being admissible at trial. State v. Faruqi, 344 S.W.3d 193, 203 (Mo. banc 2011), citing Ashcraft v. Tennessee, 322 U.S. 143, 155 (1944). "The test for whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." Faruqi, 344 S.W.3d at 203 (internal quotations omitted). In order for a defendant's statements to be considered involuntary due to coercive tactics by the police, it must be demonstrated that the defendant's "will was overborne" as a result of said tactics. State v. Mateo, 335 S.W.3d 529, 537 (Mo. App. W.D. 2011).

In determining whether a defendant's confession resulted from improper coercion, this Court considers factors such as age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion. Faruqi, 344 S.W.3d at 203. The Court also considers whether the defendant was advised of his rights and understood them, the length of the detention, the repeated and prolonged nature of the questioning, the presence of police coercion and intimidation, and the use of coercive techniques such as deprivation of food, water, or other physical needs. Id.; Rousan, 961 S.W.2d at 845. When considering the totality of the circumstances, no single fact is dispositive. State v. Lytle, 715 S.W.2d 910, 915 (Mo. 1986). "Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary." Rousan, 961 S.W.2d at 845.

6

On April 30, 2011, police picked up Appellant and took him to the police station for questioning. Det. Ray advised Appellant, who was 18 years old, of the investigation into Victim's murder and of his rights under Miranda. Det. Ray presented Appellant with a form consenting to the collection of a buccal swab for DNA testing. Appellant told Det. Ray he could not read and had trouble understanding the form, so Det. Ray orally advised Appellant about the information on the form. Appellant consented to the buccal swab. Appellant was in the holding cell approximately two to three hours before being interviewed.

Appellant was then moved into an interview room equipped with video and audio recording. During the first interview, which lasted 1 hour and 22 minutes, Appellant repeatedly denied that he knew Victim or had any involvement in his death. The video recording began by showing Appellant sitting by himself in the interview room, smoking a cigarette given to him by police. Appellant was rapping and then said out loud to himself that while he had never been to jail before, "at least they treated me good though." Det. Ray entered the room and showed Appellant a picture of Victim. Det. Ray then falsely told Appellant there were eyewitnesses who saw Appellant in Victim's car the night he was killed. Appellant denied this and asked if any of the witnesses had picked him out. Det. Ray told Appellant he was under arrest for murder and again gave Appellant the Miranda warnings. Appellant stated he understood his rights and that he did not know anything about the murder. Det. Ray told Appellant he knew Appellant had told his family about the killing, which Appellant denied. As Det. Ray got up to leave the room, Appellant asked what evidence police had to prove he killed Victim and which family members had talked to police. Det. Ray falsely told Appellant that witnesses saw

7

Appellant sitting in Victim's car with his feet out of the door when they heard the gunshots. Det. Ray told Appellant these witnesses had picked Appellant's picture out of a photo array. Appellant demanded to know who identified him and which family members told police he committed the murder. Det. Ray told Appellant he was a "cold-blooded killer" who should get the "needle" or the "gas chamber." Appellant asked to see the recording of his admission to the killing. When Appellant was taken out of the interview room to listen to Rogers's recording at Det. Ray's desk, Appellant can be heard on the interview audio recording saying the voice on Rogers's recording was not his. The recording equipment was then turned off, concluding the first interview.

Appellant was returned to the interview room. About 15 to 20 minutes later, Det. Sailor started the booking process and Appellant asked Det. Sailor what was happening. Det. Sailor advised Appellant that he was being booked for first-degree murder, first-degree robbery and armed criminal action. Appellant responded, "F---, no, this is big boy s---," and told Det. Sailor he wanted to tell the detectives what happened.

The detectives reactivated the camera to begin the second interview, which lasted 22 minutes. At the beginning of the recording, Det. Sailor gave Appellant a cigarette and again advised Appellant of his Miranda rights. Appellant stated he understood his rights. Appellant told the detectives he shot Victim once in the head after Victim put A.J. in a headlock while sitting in Victim's car. Appellant said he took money from the car's armrest before leaving the scene. Appellant asserted A.J. returned to the car and shot Victim several more times.

During questioning, Appellant told Det. Ray he had a tenth-grade education but that he could barely read and had a learning disability for which he received a

8

government check. Appellant told Det. Ray he was not "stupid" and stated his learning disability had no effect on him. Det. Ray testified at the suppression hearing that there was nothing apparent about Appellant that led Det. Ray to believe Appellant was suffering from any physical condition or any kind of impairment that prevented Appellant from understanding what was happening. Det. Ray also testified Appellant never asked to stop the interview or to consult with an attorney.

On appeal, Appellant asserts his videotaped statements should have been suppressed as unknowingly, unintelligently, and involuntarily made in that he was incapable of understanding his Miranda rights. Appellant contends his confession was the product of a coercive interrogation because the detectives took unfair advantage of his age, illiteracy, and learning disability to obtain the statements. Appellant maintains the detectives' act of lying to him about their evidence in the case and telling Appellant he was a cold-blooded killer who should get the gas chamber were coercive police tactics. We disagree.

Contrary to Appellant's assertion, there is no evidence of any coercive police activity or that Appellant did not understand his rights. Appellant was 18 years old when he was detained and interviewed for Victim's murder, making him an adult, not a juvenile. Appellant relies heavily on the fact that he told detectives he was illiterate during the interview for support yet provides no explanation as to how this affected Appellant's ability to understand his rights. See Howard v. Caspari, 99 F.3d 895, 898 (8th Cir. 1996) (alleged inability to read and write does not necessarily render a confession involuntary). Here, the detectives orally advised Appellant of his Miranda rights three times and Appellant indicated he understood those rights. Although

9

Appellant told the detectives he had a learning disability and left school after the tenth grade, Appellant also told the detectives that his learning disability had no effect on him. Det. Ray testified there was nothing apparent about Appellant that led him to believe Appellant was suffering from any physical condition or any kind of impairment that prevented Appellant from understanding what was happening.

Furthermore, the fact that the detectives provided Appellant with false information regarding the investigation does not invalidate Appellant's confession. Statements obtained by subterfuge "are admissible unless the deception offends societal notions of fairness or is likely to produce an untrustworthy confession." Faruqi, 344 S.W.3d at 204 (internal quotations omitted). Det. Ray's act of falsely telling Appellant that the police had eyewitnesses placing Appellant in Victim's car when he was killed does not offend societal notions of fairness and was unlikely to produce an untrustworthy confession.

Viewing the evidence in the light most favorable to the trial court's decision, we find, under the totality of the circumstances, that Appellant's statements to police were made knowingly, intelligently, and voluntarily. Appellant was repeatedly advised of his Miranda rights, which Appellant stated he understood. Appellant was neither detained nor questioned for an unduly long period of time and there is no evidence Appellant was deprived of food, water, or any other physical need. Appellant was not threatened with physical harm. Appellant never asked to stop questioning or to speak to an attorney.

There is no evidence that Appellant's confession was the result of coercion that overbore his will and deprived him of his free choice to admit, deny, or refuse to answer the detectives' questions. See Faruqi, 344 S.W.3d at 203; Mateo, 335 S.W.3d at 537. The

10

trial court did not err in denying Appellant's motion to suppress. Appellant's Point I is denied.

## Point II - Cell Phone Records Testimony

In his second point, Appellant argues the trial court erred in denying his motion to strike Det. Ray's testimony, or in the alternative, request for a mistrial after Det. Ray testified he reviewed Victim's cell phone records and determined a call was made to Victim's cell phone from Appellant's mother's phone within an hour of Victim's death because the State failed to lay a proper foundation for admitting Det. Ray's testimony. Appellant contends this testimony constituted inadmissible hearsay and its admission prejudiced him.

At trial, Det. Ray identified State's Exhibit 9 as Victim's cell phone records, which he obtained as part of his investigation. Det. Ray testified Victim received a call approximately an hour before he was murdered. Det. Ray stated that further investigation revealed this call was initiated from Appellant's mother's phone and was the same number Appellant gave as an emergency contact number when he was arrested. Appellant did not object to this testimony.

The next day of trial, when counsel and the court were discussing the exhibits, Appellant objected to the admission of State's Exhibit 9, asserting no foundation had been laid for its admission as a business record. The court sustained Appellant's objection to the exhibit but not to Det. Ray's testimony about the exhibit. Appellant then moved to strike the detective's testimony regarding the phone records, explaining he did not object because he believed the prosecutor was "going to lay the proper foundation for

11

the business records affidavit." The court overruled Appellant's motion to strike. Appellant moved for a mistrial, which the court denied.

To preserve a claimed error for review, the defendant must make a specific objection to the evidence when it is offered at trial. State v. Nylon, 311 S.W.3d 869, 884 (Mo. App. E.D. 2010). If the defendant fails to properly object at trial, the claimed error may only be reviewed for plain error. Id. Under plain error review, the defendant must show that an evident, obvious, and clear error affected a substantial right resulting in manifest injustice or a miscarriage of justice. Rule 30.20[1]; State v. Washington, 260 S.W.3d 875, 879 (Mo. App. E.D. 2008). It is the defendant's burden to demonstrate that the error prejudiced him. State v. Johnson, 220 S.W.3d 377, 385 (Mo. App. E.D. 2007). Trial court error is not prejudicial unless there is a reasonable probability that the error affected the outcome of the trial. State v. Forrest, 183 S.W.3d 218, 224 (Mo. banc 2006).

Appellant did not preserve the issue for review because he failed to object to Det. Ray's testimony when it was introduced at trial. As such, we will review Appellant's claim for plain error only.

Here, Appellant has not demonstrated that the alleged error prejudiced him, resulting in manifest injustice or a miscarriage of justice. In his videotaped confession to police, Appellant stated A.J. contacted Victim in order to arrange a meeting. Appellant's cellmate Bell testified Appellant told him he called Victim on the night of the murder in order to arrange a meeting. Therefore, Det. Ray's testimony that Victim's cell phone records indicated Victim received a phone call from a phone number connected with Appellant an hour before Victim's murder was cumulative of other evidence. "Generally, prejudice does not exist when the objectionable evidence is merely cumulative of other

---

[1] All rule references are to Mo. R. Crim. P. 2015, unless otherwise indicated.

evidence that was admitted without objection and that sufficiently establishes essentially the same facts." State v. Kelly, 367 S.W.3d 629, 630 (Mo. App. E.D. 2012) (internal citations omitted).

Furthermore, Appellant was not prejudiced by the admission of Det. Ray's testimony regarding Victim's cell phone records because the evidence of Appellant's guilt was overwhelming. Reversal on appeal is not required when the overwhelming evidence of guilt overcomes the presumption of prejudice from the erroneous admission of evidence. State v. Burton, 320 S.W.3d 170, 176 (Mo. App. E.D. 2010). The evidence against Appellant consisted of two videotaped confessions, one unknowingly obtained by Rogers and the other during a police interview, the veracity of which was confirmed by other corroborating evidence presented at trial.

The trial court did not plainly err in denying Appellant's motions to strike the testimony of Det. Ray or to declare a mistrial. Appellant's Point II is denied.

<u>Point III - Eighth Amendment Challenge</u>

In his final point, Appellant argues the trial court plainly erred in imposing a mandatory sentence of life without the possibility of parole for first-degree murder because Appellant was 18 years and 11 days old, had a learning disability, and was illiterate when he committed the crime. Appellant contends that under Miller, 132 S.Ct. 2455, and Hart, 404 S.W.3d 232, the sentence violated the principle of proportionality and Appellant's constitutional rights to due process of law and protections against cruel and unusual punishments.

Appellant concedes he did not preserve his claim for appeal and requests plain-error review. As already indicated, to obtain relief under plain error review, the

13

defendant must show that an evident, obvious, and clear error affected a substantial right resulting in manifest injustice or a miscarriage of justice. Rule 30.20; Washington, 260 S.W.3d at 879. It is the defendant's burden to demonstrate that the error prejudiced him. Johnson, 220 S.W.3d at 385. An unauthorized sentence affects substantial rights and results in manifest injustice and it is plain error for a trial court to impose a sentence in excess of that authorized by law. State v. Greer, 348 S.W.3d 149, 153 (Mo. App. E.D. 2011).

Appellant was found guilty of first-degree murder under Section 565.020,[2] which provides:

> 1. A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter.
> 2. Murder in the first degree is a class A felony, and the punishment shall be either death or imprisonment for life without eligibility for probation or parole, or release except by act of the governor; except that, if a person has not reached his sixteenth birthday at the time of the commission of the crime, the punishment shall be imprisonment for life without eligibility for probation or parole, or release except by act of the governor.

Here, the State did not seek the death penalty so the trial court was required to sentence Appellant, if convicted, to life without the possibility for parole.

Although Appellant does not expressly challenge the constitutionality of Section 565.020, his claim could be construed as such. Pursuant to Article 5, Section 3 of the Missouri Constitution, this Court does not have jurisdiction over a claim challenging the constitutionality of a statute. The mere assertion that a statute is unconstitutional, however, does not deprive this Court of jurisdiction unless the claim is real and substantial and not simply colorable. State v. Stone, 926 S.W.2d 895, 898 (Mo. App.

---

[2] All statutory references are to RSMo 2006.

W.D. 1996). A constitutional claim is substantial when a preliminary inquiry shows "a contested matter of right, involving some fair doubt and reasonable room for controversy[.]" Id. However, if the claim is so obviously unsubstantial and insufficient as to be plainly without merit and a mere pretense, the claim may be deemed merely colorable. Id. We find Appellant's constitutional claim is merely colorable.

The Eighth Amendment to the United State Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In determining whether a punishment is cruel and unusual, "courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" Graham v. Florida, 560 U.S. 48, 58 (2010), quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976). The Cruel and Unusual Punishments Clause prohibits not only the imposition of inherently barbaric punishments but those that are disproportionate to the crime. Graham, 560 U.S. at 59. Cases challenging the proportionality of sentences fall within two general classifications, involving either a challenge to the length of the term-of-years sentence given the totality of the circumstances of a particular case or when the Court implements the proportionality standard by categorical restrictions. Graham, 560 U.S. at 59; Miller, 132 S. Ct. at 2463-64.

Under the second classification of cases, the U.S. Supreme Court has "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." Miller, 132 S. Ct. at 2463. These include, by example, prohibiting the imposition of the death penalty for nonhomicide crimes, Kennedy v. Louisiana, 554 U.S. 407, 438 (2008), or on mentally retarded

15

defendants, <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), as a violation of the Eighth Amendment.

Under this category, the U.S. Supreme Court has also focused on juvenile offenders due to their lesser culpability. The Court has ruled that the Eight Amendment prohibits capital punishment for children, <u>Roper v. Simmons</u>, 543 U.S.551, 568 (2005), and a sentence of life without the possibility of parole for children convicted of nonhomicide offenses, <u>Graham</u>, 560 U.S. at 74 (2010). In <u>Graham</u>, the Court reasoned:

> This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood," those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime.

<u>Graham</u>, 560 U.S. at 74-75, quoting <u>Roper</u>, 543 U.S. at 574.

In <u>Miller</u>, the Court further expanded this category of cases to include a bar against the mandatory imposition of life-without-parole sentences for children in homicide cases. <u>Miller</u>, 132 S. Ct. at 2463-64. <u>Miller</u> does not prohibit sentencing a juvenile to life without parole in a homicide case, but instead requires the court to consider the particular circumstances of the crime and the offender's age and development before such sentence can be imposed. <u>Id.</u> at 2469. In <u>Hart</u>, 404 S.W.3d at 234-35, the Missouri Supreme Court recognized the <u>Miller</u> decision and held that "life without parole may not be imposed [upon a juvenile offender] unless the sentencer is given an opportunity to consider the individual facts and circumstances that might make such a sentence unjust or disproportionate."

16

By their very terms, none of this precedent supports Appellant's assertion that the trial court's imposition of a mandatory sentence of life without the possibility of parole for Appellant's conviction for first-degree murder constitutes a cruel and unusual punishment under the Eighth Amendment. The holdings of <u>Roper</u>, <u>Graham</u>, <u>Miller</u>, and <u>Hart</u> are confined to juvenile offenders. There is no dispute Appellant committed the offense when he was 18 years old and an adult. Appellant's contention that he committed the murder only 11 days after turning 18 is of no moment. <u>Graham</u> and <u>Roper</u> recognized that a clear line was necessary and "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood[.]" <u>Graham</u>, 560 U.S. at 74-75, quoting <u>Roper</u>, 543 U.S. at 574.

Courts considering <u>Miller</u> in other contexts have held that <u>Miller</u> does not apply to non-juvenile offenders. See <u>United States v. Hoffman</u>, 710 F.3d 1228, 1233 (11th Cir. 2013) ("Nothing in *Miller* suggests that an adult offender who has committed prior crimes as a juvenile should not receive a mandatory life sentence *as an adult,* after committing a further crime as an adult.") (emphasis added); <u>United States v. Orona</u>, 724 F.3d 1297, 1307 (10th Cir. 2013) ("Unlike the defendants in <u>Roper</u> and <u>Graham</u>, [the defendant] is being punished for his adult conduct."); <u>United States v. Hunter</u>, 735 F.3d 172, 176 (4th Cir. 2013) (the defendant was not a juvenile when he committed the crime for which he was being sentenced and <u>Miller</u>'s particular concerns to juvenile offenders did not apply). Appellant has cited no authority suggesting the Eighth Amendment bar against imposing a mandatory life-without-parole sentence on a juvenile in a homicide case, as articulated in <u>Miller</u> and <u>Hart</u>, should be extended to adult offenders.

The trial court did not err in imposing the mandatory sentence of life without the possibility of parole for Appellant's conviction of first-degree murder. Based on the foregoing, Appellant's Point III is denied.

Conclusion

The judgment of the trial court is affirmed.

Sherri B. Sullivan, P.J.

Mary K. Hoff, J., and
Mark D. Pfeiffer, Sp.J., concur.