**STATE of Missouri, Respondent,**

v.

**Esteban MENDEZ-ULLOA, Appellant.**

**No. ED 104556**

Missouri Court of Appeals,
Eastern District,
DIVISION ONE.

FILED: August 15, 2017

Emmett D. Queener, for appellant.

Joshua D. Hawley and Daniel N. McPherson, for respondent.

KURT S. ODENWALD, Judge

## Introduction

Esteban Mendez-Ulloa ("Mendez-Ulloa")[1] appeals from the trial court's judgment that was entered after a jury trial. A jury convicted Mendez-Ulloa on two counts of first-degree child molestation. Mendez-Ulloa raises two points on appeal: First, the trial court erred in admitting a video recording of his pretrial statements to police detectives because he did not validly waive his right to remain silent. Second, the trial court erred in allowing the jury to read a transcript of the video recording, which translated Spanish-spoken statements to English, because the transcript was not admitted into evidence. Mendez-Ulloa, however, failed to preserve both points for our review. Finding no plain error, we affirm.

## Factual and Procedural History

Mendez-Ulloa lived with his significant other, their son, and her daughter ("Victim") from another relationship. Victim reported that Mendez-Ulloa had touched her inappropriately. Eventually, Victim was interviewed at the Children's Advocacy Center ("CAC"). Victim told the CAC interviewer that, during the previous summer, Mendez-Ulloa had talked to her about sex and demonstrated how to kiss with the tongue. Victim also accused Mendez-Ulloa of touching her breasts and vaginal area over her clothes, and forcing her to touch his penis over his underwear.

Detective Kendra House ("House"), who was in charge of the investigation, asked Detective Juan Gomez ("Gomez") to interpret for her when she questioned Mendez-Ulloa. Gomez had lived in Argentina until he was eight-years old and spoke an Argentine dialect of Spanish. (Mendez-Ulloa spoke a Mexican dialect of Spanish.) House and Gomez located Mendez-Ulloa at his work one day and asked if he would accompany them to the police station. Mendez-Ulloa agreed.

At the police station, House began interrogating Mendez-Ulloa, with Gomez interpreting for her. When the interrogation started, Gomez asked Mendez-Ulloa in Spanish if he understood what Gomez was saying; Mendez-Ulloa said he did. Gomez then cautioned Mendez-Ulloa to speak up if he did not understand any question. Again, Mendez-Ulloa indicated that he understood.

Gomez read Mendez-Ulloa his Miranda[2] rights in Spanish. The Miranda rights were also printed in Spanish on a warning-and-waiver form. After Gomez read each individual right (for example, the right to remain silent), Mendez-Ulloa stated that he understood. Gomez then read the waiver provision from the form, which indicated that Mendez-Ulloa understood his rights and was willing to talk to the detectives, and again asked Mendez-Ulloa if he understood. At this point, Mendez-Ulloa inquired, "One question, how is, how do I say? How is the problem?" Gomez replied, "Well, before touching that subject, we would like you to sign. At any time, you can stop talking. Okay? If you want to

---

1. The appellant's first and last names are spelled inconsistently throughout our record. His first name is spelled both "Esteban" and "Estaban"; the appellant spelled his first name with an "e" on a warning-and-waiver form, so we will use that spelling here: Esteban's full last name appears throughout the

record as "Mendezulloa," "Mendez-Ulloa," and "Mendez Ulloa." "Mendez-Ulloa" appears to be the predominant spelling, so we will use it here. We intend no disrespect.

2. <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

speak with us and you want to speak about the subject ... [w]rite your name in uppercase." [3] Mendez-Ulloa signed the waiver.

After the Miranda warnings, House questioned Mendez-Ulloa, with Gomez translating. Throughout the interview, Mendez-Ulloa continuously denied committing any crime. He acknowledged kissing Victim, but claimed that those kisses were innocent pecks, often before leaving the house when saying goodbye. These kisses, according to Mendez-Ulloa, did not involve the tongue. Mendez-Ulloa categorically denied touching Victim inappropriately, despite many questions to that effect. Eventually, without confessing, Mendez-Ulloa grew frustrated with the repeated questioning and declared that he was finished answering questions.

The State charged Mendez-Ulloa with three counts of first-degree child molestation, one each for touching Victim's breasts, touching Victim's vaginal area, and forcing Victim to touch his penis. The case proceeded to a jury trial.

Before trial, Mendez-Ulloa filed a motion to suppress the statements that he made to the detectives, arguing that his statements were involuntary and that he did not knowingly and intentionally waive his Miranda rights. At the suppression hearing, Gomez testified that he specifically asked if Mendez-Ulloa understood Gomez's Spanish, and Mendez-Ulloa indicated that he did. Gomez, however, acknowledged that Argentine Spanish is a little different from Mexican Spanish and that meaning could theoretically get lost in translation. Nevertheless, Gomez did not perceive any significant language barrier between himself and Mendez-Ulloa. Mendez-Ulloa also testified at the suppression hearing. This interrogation was the first

time Mendez-Ulloa had been contacted by police in the United States since he arrived from Mexico in 1997. In Mexico, Mendez-Ulloa testified, if you did not talk to police, they would beat you up. To him, the Miranda warning's statement, "Tiene derecho a permanecer en silenco," meant to stay quiet, to not become rebellious, profane, or disrespectful. Mendez-Ulloa did not feel threatened, but he felt obligated to sign the warning-and-waiver form. After the hearing, the trial court overruled Mendez-Ulloa's motion to suppress.

During trial, a video recording of Mendez-Ulloa's statements to police was marked as State's Exhibit 3-A, and a corresponding transcript was marked as State's Exhibit 3-B. The transcript contained two columns. The left column was a verbatim transcription; everything spoken in English was transcribed in English, and everything spoken in Spanish was transcribed in Spanish. The right column contained a Spanish-to-English translation of everything that was shown in Spanish on the left side. The State asked the trial court to provide this transcript to the jury while the video recording was played.

Before the video recording was introduced into evidence, the trial court informed counsel that it had reviewed the video recording inside the courtroom and determined that the transcript would assist the jury in understanding and listening to the video recording. Defense counsel objected, contending that it was difficult to keep up with the transcript because of the three individuals speaking and the two columns of text. Further, defense counsel objected that there were short conversations between Gomez and Mendez-Ulloa that were not transcribed. Defense counsel did not identify any specific conversations. These two problems, in defense counsel's

---

**3.** Both Mendez-Ulloa's question and Gomez's reply were in Spanish.

view, made the transcript confusing. As such, defense counsel requested that the jury not see the transcript. The trial court asked if a dispute existed as to the translation's accuracy; defense counsel responded:

> I'm not disputing the translation itself, but there are portions where it's either inaudible or there's conversation between Detective Gomez and the client that aren't transcribed here, small differences, and that's why we're opposed to the transcript. The transcript in and of itself is already confusing and will be further confusing if the jury is just trying to read through it to try and keep up.

The court overruled the objection and allowed the jury to read the transcript while the video recording played. The trial court instructed the jury that the video recording, not the transcript, was the evidence, and that the jury should believe the video recording in the event that there was a discrepancy between the two.

After the evidence concluded, the jury found Mendez-Ulloa guilty on two counts of first-degree child molestation—one count for touching Victim's vagina and one count for making Victim touch his penis. The jury, however, acquitted Mendez-Ulloa on the count for touching Victim's breasts. The trial court sentenced Mendez-Ulloa to a total of five years in prison. Mendez-Ulloa appeals.

### Points on Appeal

Mendez-Ulloa raises two points on appeal. In Point One, Mendez-Ulloa argues that the trial court plainly erred in denying his motion to suppress, because the dissimilarity between Mexican Spanish (his dialect) and Argentine Spanish (Gomez's dialect) resulted in Mendez-Ulloa not fully understanding that he had a right to remain silent. In Point Two, Mendez-Ulloa contends that the trial court abused its discretion by allowing the jury to read the transcript while the video recording played. This transcript, Mendez-Ulloa asserts, contained a translation (Spanish to English) of significant portions of the interview, which went beyond merely transcribing the interview for the assistance of the jurors.

### Discussion

### I. Preservation of Error & Plain-Error Review

■ Mendez-Ulloa failed to preserve both of his points on appeal, As for Point One, which asserts a claim based on his motion to suppress, Mendez-Ulloa concedes that his point is unpreserved. Although Mendez-Ulloa filed a pretrial motion to suppress and renewed his objection at trial, the claim was not included in his motion for new trial. As such, it was not preserved. See State v. Purifoy, 495 S.W.3d 822, 826 (Mo. App. S.D. 2016). Point Two also relies on an unpreserved claim of error. Because the preservation analysis in Point Two requires greater depth, we will discuss it later in conjunction with our discussion of that point.

■ Unpreserved claims of error can only be reviewed, in our discretion, for plain error. Rule 30.20. Plain errors must be "evident, obvious, and clear." State v. Taylor, 466 S.W.3d 521, 533 (Mo. banc 2015). Review for plain error is a two-step process. State v. Walter, 479 S.W.3d 118, 131 (Mo. banc 2016). "First, the Court determines whether the claim of error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice has resulted." Id. Second, if the first step is satisfied, we determine whether the alleged error actually resulted in manifest injustice. Id.

## II. Point One—Admission of the Post-Miranda Statements

■ Mendez-Ulloa argues that the trial court plainly erred in denying his motion to suppress. Specifically, Mendez-Ulloa contends, in his Point Relied On, that the State did not prove that he "knowingly and intelligently waived his privilege against self-incrimination because the dissimilarity of Argentin[e] Spanish and Mexican Spanish resulted in Esteban not fully understanding that he had the right to remain silent."

■ We first note that it is unclear upon what legal doctrine Mendez-Ulloa is relying. In his Point Relied On, Mendez-Ulloa argues that the State failed to prove that he "knowingly and intelligently" waived his privilege against self-incrimination. This argument refers to whether Mendez-Ulloa validly waived his Miranda rights. See Berghuis v. Thompkins, 560 U.S. 370, 382, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (under Miranda, a statement made during a custodial interrogation is inadmissible at trial *unless* the prosecution can establish that the accused "in fact knowingly and voluntarily waived [Miranda] rights"). But in the argument section of his brief, Mendez-Ulloa cites cases addressing the voluntary nature of a confession under the Fourteenth Amendment's Due Process Clause.[4] See, e.g., State v. Reed, 502 S.W.3d 79, 84 (Mo. App. E.D. 2016) (outlining the involuntary-confession doctrine). Then, reverting to the Miranda-waiver context, Mendez-Ulloa asserts that he did not fully understand his right to remain silent.

■ The voluntariness of a confession and the valid waiver of one's Miranda rights are two separate, if sometimes related,[5] issues based on different constitutional provisions. See, e.g., Colorado v. Connelly, 479 U.S. 157, 163-71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (the Supreme Court of the United States analyzed the two doctrines separately); see generally 2 Wayne R. LaFave et al., Criminal Procedure §§ 6.2, 6.9 (4th ed. 2015) (§ 6.2 explains the scope of the involuntary-confession doctrine, and § 6.9 articulates the considerations involved in waiving one's Miranda rights). Because Mendez-Ulloa's Point Relied On only claims that he did not knowingly and intelligently waive his Miranda rights, we will consider *only* that argument. See Rule 84.04(e) (stating that an appellant's argument section must "substantially follow" the order of and is limited to the errors included in the Points Relied On). Hence, we do not address any involuntary-confession argument that Mendez-Ulloa may be making.

Further, we reject Mendez-Ulloa's argument to the extent it asserts that the trial court plainly erred in finding his Miranda waiver to be knowing and intelligent. Mendez-Ulloa has not satisfied the first prong in our plain-error analysis, because he has not shown, on the face of the record, any error that is evident, obvious, and clear. Taylor, 466 S.W.3d at 533.

■ Under Miranda, a statement made during a custodial interrogation is inadmissible at trial *unless* the prosecution can establish that the accused "in fact

---

4. The cases that Mendez-Ulloa cites, for example, are State v. Lytle, 715 S.W.2d 910, 915 (Mo. banc 1986); Culombe v. Connecticut, 367 U.S. 568, 635, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Rogers v. Richmond, 365 U.S. 534, 540-41, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Blackburn v. Alabama, 361 U.S.

199, 211, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). All of which are involuntary-confession cases.

5. Both doctrines, for instance, consider the voluntariness of the defendant's actions—in confessing and in waiving Miranda rights, respectively.

knowingly and voluntarily waived [Miranda] rights" when making the statement. Berghuis, 560 U.S. at 382, 130 S.Ct. 2250 (quoting North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). The waiver inquiry, therefore, has "two distinct dimensions." Berghuis, 560 U.S. at 382, 130 S.Ct. 2250. First, the waiver must be voluntary, in the sense that it was the product of free and deliberate choice, not of intimidation, coercion, or deception. Id. at 382-83, 130 S.Ct. 2250 (citing Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Second, the waiver must be knowing and intelligent, in that it was made with a full awareness of the nature of the Miranda rights being abandoned and the consequences of the decision to abandon those rights. Id. "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Burbine, 475 U.S. at 421, 106 S.Ct. 1135 (internal citation omitted).

We treat the questioning of Mendez-Ulloa as a custodial interrogation. There appears to be no dispute on this point, as express questioning occurred at a police station and the detectives felt the need to administer the Miranda rights. Accordingly, Miranda bars the admission of the subsequent statements unless the State proved that a valid waiver occurred. In his Point Relied On, Mendez-Ulloa argues that he did not knowingly and intelligently waive his right to remain silent because he did not understand that right due to the difference between his Mexican dialect and Gomez's Argentinian dialect. This argument concerns the second dimension of the Miranda-waiver analysis.

In deciding whether a waiver is knowing and intelligent, we consider the totality of the circumstances. State v. Powell, 798 S.W.2d 709, 713 (Mo. banc 1990). The requirement of a knowing and intelligent waiver does not mean that an accused person must comprehend all possible consequence of a waiver. Id. Rather, the accused must understand the warnings themselves; that, as relevant here, he could remain silent. Id. "A knowing and intelligent waiver of the right to silence is normally shown by having a police officer testify that he read the accused his rights, asked whether the rights were understood, and received an affirmative response." State v. Wise, 879 S.W.2d 494, 505 (Mo. banc 1994), overruled on other grounds by Joy v. Morrison, 254 S.W.3d 885, 888 n.7 (Mo. banc 2008).

Here, Gomez testified that Mendez-Ulloa seemed to understand him throughout all of their conversations, despite the two speaking different dialects of Spanish. Before Gomez read the Miranda warnings, he told Mendez-Ulloa to ask if any misunderstanding occurred. As Gomez read the Miranda warnings in Spanish (which were also printed in Spanish on the warning-and-waiver form), Mendez-Ulloa indicated that he understood after each right was read. Finally, Mendez-Ulloa signed the Miranda warning-and-waiver form. These facts supported the trial court's conclusion that Mendez-Ulloa's Miranda knowingly and intelligently waived his Miranda rights. See Wise, 879 S.W.2d at 505.

Further, we find Mendez-Ulloa's argument that his different dialect created confusion (his Mexican dialect versus Gomez's Argentinian dialect) without merit. Mendez-Ulloa does not point to any specific difference between the Mexican and Argentine dialects. Our record indicates only one Spanish word that might have had a different meaning depending on the dialect. The right to remain silent was translated on the Miranda-waiver form, "Tiene

derecho a permanecer en silencio." "Permanecer," according to Gomez, means "remain" in the Argentine dialect. Gomez, however, acknowledged on cross-examination that the word might mean "stay" in a different dialect. Mendez-Ulloa does not explain how this possible dialectal difference—"you have the right to remain silent" versus "you have the right to stay silent"—affected his understanding of the right to remain silent. Moreover, Gomez translated for Mendez-Ulloa for the entire interrogation without any apparent problem stemming from their different dialects.

■ . The trial court could have believed Mendez-Ulloa's claim—that he subjectively did not understand the right to remain silent because he interpreted the right-to-silence warning as directing him to not get rebellious or disrespectful. But it is the trial court's duty, not ours, to weigh the evidence and judge witness credibility. Wise, 879 S.W.2d at 506. The trial court was free to reject Mendez-Ulloa's testimony, and the trial court did so by finding that, with a full understanding of his rights, Mendez-Ulloa waived those rights intentionally.

Mendez-Ulloa failed to demonstrate any error in admitting his subsequent statements that was evident, obvious, and clear on the face of the record. As such, no plain error occurred. Point One is denied.

## III. Point Two—Transcript of the Video Recording

Given the multiple-language aspect of the interrogation among House, Gomez, and Mendez-Ulloa, the State prepared a transcript. The transcript was divided into two columns. The left column was a verbatim transcript of everything: all English was written in English, all Spanish was written in Spanish. The right column included an English translation of all the Spanish that was written in the left col-

umn. The State wanted the jury to have the transcript while the video recording played.

### A. Preservation of Error

■ The State contends that Mendez-Ulloa failed to preserve his objection to the transcript. At a pretrial hearing, the State requested that the jury be furnished with the transcript. Defense counsel responded by noting that MAI-CR 3d 310.19 (Jan. 1, 2005) provides that a transcript is *not* evidence, and must only be used as a guide for the jury in following the video recording. But any translation of Spanish to English (as opposed to a verbatim transcript) was necessarily evidence: the jury could not understand the Spanish spoken in the video recording absent the translation. As such, defense counsel requested a live interpreter to provide an in-court translation for the Spanish portions of the interrogation. The trial court asked defense counsel if there was any dispute as to the transcript's accuracy, and defense counsel said there was not.

At trial, just before Gomez's testimony, the trial court informed the parties that it had listened to the video recording in the courtroom. The trial court believed that the transcript would assist the jury in understanding and listening to the video recording. At that time, the trial court allowed defense counsel to put an objection on the record. Defense counsel replied:

> The reason for my objection is the transcript has three individuals speaking, and it's very hard to keep up, even as I, a native speaker [of Spanish]—I had trouble keeping up with the transcript and feel that it would only confuse the jury and that the statement—the video statement would be best served if that was the only evidence the jury could have at that time.

Additionally, there are portions of the transcript where there's conversation between Detective Gomez and the client that are not transcribed in here, so there's conversations there that I think might confuse the jurors further. And that's why we object to using the transcript.

The State responded that it was "not aware of any inaccuracies or inconsistencies" between the video recording and the transcript. The trial court asked, "it was my understanding at that time [before trial] and until today that the defendant was not disputing the accuracy of the translation. Am I correct?" Defense counsel clarified that he was "not disputing the translation itself" but

> there are portions where it's either inaudible or there's conversations between Detective Gomez and the client that aren't transcribed here, small differences, and that's why we're opposed to the transcript. The transcript in and of itself is already confusing and will be further confusing if the jury is just trying to read through it to try and keep up.

The trial court overruled defense counsel's objections and allowed the State to distribute the transcript to the jury while the video recording was being played. Before distributing the transcript, the trial court read an instruction modeled after MAI-CR 3d 310.19. The instruction cautioned the jury that the transcript was "not evidence," it was simply provided for assistance in following the video recording, which was the real evidence. The instruction also clarified that the jury should be guided by the video recording if there was a discrepancy between it and the transcript.

Now, on appeal, Mendez-Ulloa argues that the trial court abused its discretion in allowing the jury to view the transcript without admitting it into evidence. Unlike a transcript of an English-language recording, the transcript here was evidence of what was said in Spanish. Stated differently, without the transcript, the jury would not have understood what was said between Gomez and Mendez-Ulloa in Spanish. The error, according to Mendez-Ulloa, was allowing the jury to see this translation despite the transcript not being formally received in evidence.

"The general rule with respect to preservation of error is that an objection stating the grounds must be made at trial, the same objection must be set out in the motion for new trial and must be carried forward in the appeal brief to preserve it." State v. Jackson, 948 S.W.2d 138, 141 (Mo. App. E.D. 1997). Rulings that the trial court makes before trial are interlocutory and preserve nothing for appeal; instead, the objection must be renewed when the objectionable evidence is offered. State v. Evans, 639 S.W.2d 820, 822 (Mo. 1982). The reason an objection must be renewed is because additional information may come to the trial court's attention that could alter its pretrial ruling. Id. The trial objection must be specific, and the point raised on appeal must rely on the same theory presented at trial. State v. Knese, 985 S.W.2d 759, 766 (Mo. banc 1999).

Here, the argument Mendez-Ulloa raises on appeal differs from the objection to the transcript he made at trial. While Mendez-Ulloa's *pretrial argument* appears similar to his appellate argument, he was required to renew that same objection at trial. He did not. Mendez-Ulloa's trial objection to providing the transcript to the jury relied exclusively on the potential for juror confusion. However, on appeal, as noted above, Mendez-Ulloa asserts only that the transcript was evidence, which should not have been provided to the jury because it was not actually received into evidence by the

trial court. Mendez-Ulloa does not assert potential juror confusion as a basis for his appeal. Because Mendez-Ulloa advances a theory on appeal that is different from that underlying his trial objection, Point Two is not preserved. As such, we can only review for plain error. See Rule 30.20.

## B. No Manifest Injustice

 Reviewing for plain error, we reiterate that, first, Mendez-Ulloa facially must establish substantial grounds for believing "a manifest injustice or miscarriage of justice has resulted." Walter, 479 S.W.3d at 131. The defendant bears the burden of establishing manifest injustice, which is determined by the individual facts and circumstances of a case. State v. Mayes, 63 S.W.3d 615, 624 (Mo. banc 2001). In any event, plain error can only serve as the basis for granting a new trial on direct appeal if the error was outcome determinative. State v. Baxter, 204 S.W.3d 650, 652 (Mo. banc 2006) (quoting Deck v. State, 68 S.W.3d 418, 427 (Mo. banc 2002)).

The record before us does not present facial grounds for believing that manifest injustice or a miscarriage of justice occurred. First, Mendez-Ulloa does not challenge the accuracy of the transcript; his brief does not identify any translational error, and defense counsel repeatedly stated at trial that he did not dispute the translation's accuracy.

Second, everything of substance that was translated from Spanish to English in the transcript was spoken in the video recording, in English, by Gomez. The interview was conducted as follows: House asked a question in English. Gomez asked that same question in Spanish. Mendez-Ulloa responded in Spanish. Gomez repeated Mendez-Ulloa's answer, in English, to House. Sometimes, Gomez and Mendez-Ulloa would have a short back-and-forth, in which Gomez would seek to clarify a question. But after the back-and-forth, Gomez would summarize that conversation in English to House. So, even without the written translation, the jury heard the substantive evidence of what was said in Spanish—House asking the original question in English, and Gomez relaying Mendez-Ulloa's Spanish answers (to House) in English.

Nothing else in our record suggests that manifest injustice occurred. Mendez-Ulloa never confessed during the interrogation. Mendez-Ulloa does not contend that Gomez misrepresented any statement when he was translating in the interrogation. Nor is there a contention that anything prejudicial was said in Spanish that the jury would have missed but for the transcript's translation. Additionally, the jury only viewed the transcript while watching the video recording, and could not review the written transcript during deliberations.

Allowing the jury to see an *accurate* translation of the Spanish conversation, the content of which was *substantially repeated* in English by Gomez in the recording, was not outcome determinative to Mendez-Ulloa's detriment.[6] Because Mendez-Ulloa has not demonstrated substan-

---

6. Mendez-Ulloa does not even attempt to identify prejudice: he would have us presume prejudice, relying on a cursory cite to State v. Babb, 680 S.W.2d 150, 152 (Mo. banc 1984). Babb is inapposite. First, Babb reviewed preserved error, so there was no plain-error review as here. Mendez-Ulloa offers no support for presuming manifest injustice. And Babb is readily distinguishable, as it involved an allegation of extrinsic communications with de-liberating jurors, who were taken to the courthouse basement during a tornado warning. Id. at 151. Our Supreme Court held that a rebuttable presumption of prejudice exists when a party moves for a new trial based on external communication with jurors during their deliberations. Id. at 152. This case, by contrast, has nothing to do with improper, post-submission communications with the jury during deliberations.

tial grounds for believing that manifest injustice occurred, he has not met his burden under our plain-error review. Point Two is denied.

### Conclusion

The judgment of the trial court is affirmed.

Robert G. Dowd, Jr., P.J., concurs.

Sherri B. Sullivan, J., concurs.