

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED111130 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Saint Francois County |
| vs. | ) | 19SF-CR00769-01 |
| | ) | |
| CHRISTOPHER L. GATES, | ) | Honorable Wendy L. Wexler Horn |
| | ) | |
| Appellant. | ) | Filed:  February 13, 2024 |

Christopher L. Gates ("Defendant") appeals the judgment, following a bench trial, finding him guilty of murder in the first degree (Count I), armed criminal action (Count II), and resisting arrest (Count III).  The trial court sentenced Defendant to consecutive terms of life imprisonment without the possibility of parole for Count I, thirty years of imprisonment for Count II, and four years of imprisonment for Count III.  We affirm.

### I.    BACKGROUND

In August 2019, the State charged Defendant with the above crimes after a woman he was dating ("Victim") was found dead in Defendant's bedroom along with various items that were covered in blood and appeared to have been used as weapons, including broken pieces of a boat oar and a plant stand.  Defendant subsequently waived his right to a jury trial, and a bench trial took place in August 2022 in the Circuit Court of St. Francois County.

**A.      Relevant Evidence Adduced at Trial and Relevant Pre-Trial Motions**

Viewed in the light most favorable to the verdicts, the following relevant evidence was adduced at Defendant's trial.  On the afternoon of June 15, 2019, a deputy with the St. Francois County Sheriff's Department ("Deputy") responded to a call regarding a possible deceased person in a residence.  After arriving at the residence, Defendant's mother ("Mother") answered the door and told Deputy there was a person in Defendant's bedroom that Mother believed was dead.  As Deputy approached the bedroom, he noticed blood spatter in the hallway and near the bedroom's entryway.  As he entered the bedroom, Deputy saw an "obviously deceased" female lying on the floor next to the bed surrounded by blood "everywhere" and Defendant lying next to Victim "covered in blood."  After Deputy identified himself as law enforcement and ordered Defendant to show his hands, Defendant refused to comply and then physically resisted arrest for several minutes, after which Deputy and other officers were finally able to remove Defendant from the residence and arrest him.

Defendant was initially taken to Parkland Hospital ("Parkland") after his arrest for assessment of any injuries, but was then transferred to Barnes-Jewish Hospital ("Barnes-Jewish") early the next morning.  While at Barnes-Jewish, Defendant was interrogated by a detective from the St. Francois County Sheriff's Department ("Detective") regarding Victim's death, and Detective recorded the entire interrogation.  At the onset of the interrogation, Detective read Defendant his *Miranda*[1] rights, after which Defendant indicated he understood his rights and signed and initialed a waiver of those rights.  During a subsequent portion of the interrogation, Defendant confessed to murdering Victim.  Prior to trial, Defendant filed a motion to suppress the statements made by Defendant during the interrogation, arguing his statements were "not

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

knowingly, voluntarily, or intelligently given" due to his "head injury," "obvious confusion[,] and altered mental state." At trial, the State played the entirety of the recording of Detective's interrogation of Defendant ("the interrogation recording") for the court, and it was admitted into evidence over Defendant's objection.

While processing the crime scene and collecting evidence, investigators found Victim's cell phone in the same bedroom where her body was discovered. Deputy testified that when he first discovered the cell phone, it "was actively recording and it looked like it had been for some time." Detective was later able to extract an audio file from Victim's phone that contained over ten hours of continuously recorded audio including, *inter alia*: conversations among Defendant, Victim, and Mother prior to Victim's murder; a "physical confrontation" between Defendant and Victim; and the arrival of Deputy and other officers, including their subsequent struggle with Defendant prior to his arrest. Before trial, Defendant filed a motion to exclude the recording from evidence, arguing the State would not be able to establish a proper foundation for its admission. The State played approximately the final two hours and thirty minutes of the audio recording from Victim's phone at trial, and the court admitted the entire recording into evidence over Defendant's objection.

B.      **Other Relevant Procedural Posture**

After hearing the above evidence, the trial court found Defendant guilty of murder in the first degree, armed criminal action, and resisting arrest. The court subsequently sentenced Defendant to consecutive terms of life imprisonment without the possibility of parole for murder in the first degree, thirty years of imprisonment for armed criminal action, and four years of imprisonment for resisting arrest. This appeal followed.[2]

---

[2] To avoid unnecessary repetition, additional facts relevant to each of Defendant's points on appeal will be set forth in Sections II.A. and II.B. of this opinion.

## II.    DISCUSSION

Defendant raises two points on appeal.  In his first point, Defendant argues the trial court erred in admitting the audio recording from Victim's phone into evidence.  Defendant's second point on appeal contends the trial court erred in denying his motion to suppress and in admitting the interrogation recording into evidence.  To aid with the flow of the analysis, we will address Defendant's points on appeal in reverse order.

### A.    Defendant's Point on Appeal Regarding Admission of the Interrogation Recording

We begin by addressing Defendant's second point on appeal contending the trial court erred in admitting the interrogation recording into evidence.  Defendant argues the statements made during the interrogation should have been excluded at trial because the waiver of his *Miranda* rights prior to speaking with police officers was "unknowing, involuntary, and unintelligent."

#### 1.    Standard of Review

For purposes of this appeal only, we assume *arguendo* that Defendant preserved his claim that the trial court erred in admitting the interrogation recording into evidence.  This Court will affirm the trial court's ruling on a motion to suppress unless it is clearly erroneous.  *State v. Watkins*, 618 S.W.3d 265, 268-69 (Mo. App. E.D. 2021).  A ruling is clearly erroneous when we are left with the definite and firm conviction that a mistake was made.  *Id.*  We view the facts and any reasonable inferences therefrom in the light most favorable to the trial court's ruling, and we defer to the credibility determinations of the trial court.  *State v. Bates*, 464 S.W.3d 257, 262 (Mo. App. E.D. 2015).  Questions of law are subject to *de novo* review.  *Id.*

4

## 2.     General Law

When a defendant challenges the admissibility of a statement made during a custodial interrogation, the State must demonstrate the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights when making the statement. *State v. Mendez-Ulloa*, 525 S.W.3d 585, 591-92 (Mo. App. E.D. 2017) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010)). Accordingly, a waiver of *Miranda* rights by a defendant must be both: (1) voluntary, meaning it was the product of free and deliberate choice and not of intimidation, coercion, or deception; and (2) knowing and intelligent, meaning it was made in full awareness of the rights being abandoned and the consequences of the decision to abandon them. *Mendez-Ulloa*, 525 S.W.3d at 592 (citing *Berghuis*, 560 U.S. at 382-83).

## 3.     Analysis and Conclusion as to Defendant's Argument on Appeal

Defendant's statements at issue in this case occurred during a custodial interrogation, and neither party argues otherwise on appeal. Defendant also makes no substantive argument on appeal regarding any intimidation, coercion, or deception which would have rendered Defendant's *Miranda* waiver involuntary. *See id*. Furthermore, Defendant primarily argues his statements during the interrogation were improperly admitted due to his physical and mental condition, which is insufficient to show his statements were involuntary in the absence of any evidence of coercion by interrogating officers. *See State v. Schnick*, 819 S.W.2d 330, 338 (Mo. banc 1991). Therefore, we are left solely with the issue of whether Defendant made a knowing and intelligent waiver of his *Miranda* rights. *See Mendez-Ulloa*, 525 S.W.3d at 592 (citing *Berghuis*, 560 U.S. at 382-83).

Whether a *Miranda* waiver is knowing and intelligent is determined based on the totality of the circumstances in each particular case, accounting for the background, experience, and

5

conduct of the defendant. *Knese v. State*, 85 S.W.3d 628, 633 (Mo. banc 2002). A knowing and intelligent waiver is normally demonstrated through police officer testimony that the defendant was read his rights and responded affirmatively when asked whether the rights were understood. *Watkins*, 618 S.W.3d at 269 (citing *State v. Wise*, 879 S.W.2d 494, 505 (Mo. banc 1994) (overruled on other grounds by *Joy v. Morrison*, 254 S.W.3d 885, 888 n.7, 888-89 (Mo. banc 2008)). A knowing and intelligent *Miranda* waiver does not mean a defendant must have comprehended all possible consequences of the waiver, only that he understood he did not have to speak to police without an attorney present and that his statements could be used against him. *Knese*, 85 S.W.3d at 634.

Defendant was initially taken to Parkland after his arrest but was transferred to Barnes-Jewish early the next morning, where he was later interrogated by Detective. Detective testified at trial that when he began the interrogation, he read Defendant his *Miranda* rights, Defendant indicated he understood those rights, and Defendant then initialed and signed a *Miranda* waiver. This Court's review of the interrogation recording further reveals that after being read his *Miranda* rights, Defendant gave multiple clear verbal replies confirming he understood those rights. Defendant's conduct combined with his signature on the waiver form and his initials next to each individual right demonstrates a pattern from which it is reasonable to infer Defendant knowingly and intelligently waived his *Miranda* rights. *See Watkins*, 618 S.W.3d at 269-70; *see also Bates*, 464 S.W.3d at 262.

Defendant argues his *Miranda* waiver was not knowing and intelligent because he was "frequently nonsensical during [Detective's] interrogation," which was indicative of his "precarious mental state." To support his argument, Defendant highlights several specific statements he made at intermittent times during an interrogation which lasted approximately one

6

hour and forty-seven minutes. However, the earliest of these statements occurred over ten minutes after Defendant responded clearly and affirmatively that he understood his *Miranda* rights and signed and initialed the waiver form. Furthermore, the content of the statements at issue did not concern Defendant's *Miranda* rights, much less indicate any issues with Defendant's ability to understand those rights and the consequences of abandoning them. *See Mendez-Ulloa*, 525 S.W.3d at 592 (citing *Berghuis*, 560 U.S. at 382-83).

Defendant further supports his claim that he did not knowingly and intelligently waive his rights with an assessment from his Parkland medical records which noted him as having an "[a]ltered mental status, unspecified" at the time of his discharge and transfer to Barnes-Jewish (emphasis omitted).[3] However, this assessment from Defendant's brief stay at Parkland does not render his *Miranda* waiver unknowing and unintelligent. Defendant's *Miranda* waiver and interrogation took place at Barnes-Jewish sometime after he was discharged from Parkland, and the record is entirely devoid of any medical records or assessments from Defendant's time at Barnes-Jewish. Additionally, Defendant has presented no detailed evidence regarding the assessment of his mental status at Parkland, specifically what the assessment meant and how it rendered him unable to understand the *Miranda* warnings.[4] *See State v. Powell*, 798 S.W.2d 709, 712-13 (Mo. banc 1990) (holding a *Miranda* waiver was knowing and intelligent despite

---

[3] Defendant's Parkland medical records were not submitted as an exhibit in the record on appeal, but they were submitted as an exhibit to the trial court in Defendant's underlying criminal case. In the interests of judicial efficiency, this Court takes notice of Exhibit A filed under Cause No. 19SF-CR00769-01. *See Branch v. State*, 531 S.W.3d 621, 623-24 (Mo. App. E.D. 2017); *see also Environmental Utilities, LLC v. Public Service Com'n*, 219 S.W.3d 256, 265 (Mo. App. W.D. 2007) ("[c]ourts may take judicial notice of other proceedings when the cases are interwoven or interdependent").

[4] Defendant appears to argue on appeal only that his mental state *as assessed at Parkland* prevented a knowing and intelligent waiver of his *Miranda* rights, not that he had a general ongoing or underlying mental condition that prevented him from understanding his *Miranda* rights. Nevertheless, we note that "a deficient mental condition . . . does not by itself render a statement unintelligent." *State v. Bucklew*, 973 S.W.2d 83, 89-90 (Mo. banc 1998) (rejecting the defendant's claim that medication affected his mental state and holding a *Miranda* waiver was knowing and intelligent); *see also State v. Scott*, 841 S.W.2d 787, 789 (Mo. App. E.D. 1992) (rejecting the defendant's argument that mental illness made him incompetent and holding a *Miranda* waiver was knowing and intelligent).

evidence the defendant "lacked [] mental capacity," in part because "[n]o direct evidence was presented that [the] defendant did not, in fact, understand the warnings").

Under the totality of the circumstances in this case, *Knese*, 85 S.W.3d at 633, we agree with the trial court's finding that Defendant made a knowing and intelligent waiver of his *Miranda* rights. Defendant's overall conduct and affirmative responses when asked if he understood his rights, as evidenced by the interrogation recording and Detective's testimony at trial, along with his signature and initials on the waiver form, demonstrate Defendant understood his *Miranda* rights and knowingly and intelligently waived them. *See Watkins*, 618 S.W.3d at 269-70; *see also Bates*, 464 S.W.3d at 262. Accordingly, the trial court did not err in denying Defendant's motion to suppress and admitting the interrogation recording into evidence. Defendant's second point on appeal is denied.

**B.** **Defendant's Point on Appeal Regarding Admission of the Audio Recording from Victim's Phone**

Defendant's remaining point on appeal argues the trial court committed reversible error in admitting an audio recording from Victim's phone into evidence at trial. For the reasons discussed below, we disagree.

**1.** **General Standard of Review**

The admissibility of an audio recording depends on the particular circumstances of each case, and our review of the trial court's decision is for an abuse of discretion. *State v. McFadden*, 369 S.W.3d 727, 752 (Mo. banc 2012). The trial court maintains broad discretion when determining the admissibility of an audio recording. *Id*. "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances or is so arbitrary and unreasonable as to shock the sense of justice and suggest a lack of careful consideration." *State v. Washington*, 512 S.W.3d 118, 122 (Mo. App. E.D. 2017). Regarding the admission of

8

evidence, an appellate court reviews not only for error but also for prejudice, and we will reverse the trial court's decision only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Anderson*, 76 S.W.3d 275, 277 (Mo. banc 2002).

### 2. Defendant's Argument on Appeal

Defendant argues the State failed to establish a proper foundation for admission of the audio recording from Victim's phone, and that the admission of this evidence prejudiced him by affecting the outcome of his trial. We hold that no reversible error occurred under the circumstances of this case for two independent reasons: (1) the trial court did not err in admitting the audio recording from Victim's phone into evidence; and (2) Defendant was not prejudiced by the trial court's admission of the audio recording.

### 3. Analysis of the State's Foundation for Admission of the Audio Recording from Victim's Phone

To establish a proper foundation for the admission of an audio recording, a party must demonstrate:

> (1) the device was capable of recording accurately; (2) the operator of the recording device was competent to operate it; (3) the recording is authentic and correct; (4) changes, additions and deletions have not been made to the recording; (5) the recording has been preserved in an acceptable manner; (6) the speakers are identified; and (7) the conversation was voluntary and without inducement.

*Id*. The State demonstrated each of these foundational elements at trial.

Regarding the first element, the existence of the recording demonstrated Victim's cell phone was capable of recording, and the State presented testimony from Deputy that the recording from Victim's phone contained a fair and accurate representation of his interactions with Defendant, demonstrating the device's ability to record accurately. *See id*. at 752-53. As for the second element, the recording's existence and Deputy's testimony regarding its accuracy, combined with the fact that the cell phone was still actively recording when police began

9

securing the crime scene and seizing evidence, make it reasonable to infer the cell phone's operator was competent to operate it. *See id*. and *State v. Fletcher*, 948 S.W.2d 436, 439-40 (Mo. App. W.D. 1997) (both allowing for reasonable inferences based on facts and circumstances specific to the case).

As required under the third element, the State established that the recording from Victim's phone was authentic and correct through testimony from two witnesses. *See McFadden*, 369 S.W.3d at 752-53. Deputy testified the recording contained a fair and accurate representation of his interactions with Defendant near the end of the ten-hour-and-thirty-three-minute recording. *See id*. at 753. Additionally, Detective testified that he listened to the recording and was able to identify the voices on it, including Deputy, Defendant, and Mother, and that the individuals on the recording referred to each other by their first names in a consistent manner. *See Fletcher*, 948 S.W.2d at 439-40 (indicating that an officer's identification of the voices on a recording helped establish its authenticity). Testimony from both Deputy and Detective addressing the authenticity of the recording on Victim's phone sufficiently established that the recording was what the State purported it to be. *See Washington*, 512 S.W.3d at 124-25. Detective's testimony was also sufficient to satisfy the sixth element requiring identification of the speakers on a recording. *See McFadden*, 369 S.W.3d at 752-53.

The State met the requirements of the fourth element when Detective testified that he personally extracted the audio file directly from Victim's cell phone, the phone appeared to be in good condition, and that no changes, additions, or deletions were made to the recording. *See State v. Wahby*, 775 S.W.2d 147, 154 (Mo. banc 1989). To satisfy the fifth element regarding preservation of the recording, the State need not show "hand-to-hand" custody and the "[p]ositive identification of a [] recording renders the chain of custody issue moot." *McFadden*,

369 S.W.3d at 753 (citations omitted). In this case, because the aforementioned testimony from both Deputy and Detective positively identified the recording, chain of custody under the fifth element is moot. *See id*. As to the final element requiring demonstration of the voluntariness of the interactions on the recording, the circumstances of this case support the reasonable conclusion that Defendant's participation in the recorded interactions was voluntary, and Defendant makes no argument otherwise.[5] *See id*. at 752-53; *Fletcher*, 948 S.W.2d at 439-40.

Based on the foregoing, the trial court's admission of the recording from Victim's phone was not against the logic of the circumstances in this case or "so arbitrary and unreasonable as to shock the sense of justice and suggest a lack of careful consideration." *See Washington*, 512 S.W.3d at 122. Accordingly, the trial court did not abuse its discretion in admitting the recording into evidence. *See id*.; *McFadden*, 369 S.W.3d at 752.

4. **Analysis of Prejudice to Defendant from the Admission of the Audio Recording from Victim's Phone**

Reversal of a trial court's decision is not required when the overwhelming evidence of a defendant's guilt overcomes any presumption of prejudice from the allegedly erroneous admission of evidence. *State v. Burton*, 320 S.W.3d 170, 176 (Mo. App. E.D. 2010). Furthermore, in a bench-tried case, the trial court is granted more latitude in the admission of evidence. *State v. King*, 626 S.W.3d 828, 841 (Mo. App. E.D. 2021). "We presume a judge will

---

[5] Defendant argues the State failed to show the statements were voluntarily made "because there was no evidence [the recorded individuals were] actually aware the female voice was recording [the] . . . conversation, much less that the [recorded] male had consented to . . . making such a recording." In other words, Defendant argues the recording was made without consent from all recorded parties, not that the interactions that took place on the recording were somehow involuntary or induced. Consent from any party captured on a recording is not required to establish a proper foundation for admission of an audio recording at trial. *See McFadden*, 369 S.W.3d at 752; *see also Fletcher*, 948 S.W.2d at 437, 439-40 and *State v. Simpson*, 779 S.W.2d 274, 280, 282-83 (Mo. App. S.D. 1989) (both finding no error in the admission of a recorded conversation where the conversation was recorded without the defendant's knowledge or consent).

not give weight to incompetent evidence, and, as such, it is difficult to base reversible error on the improper admission of evidence in a court-tried case." *Id*. (citation omitted).

Defendant was not prejudiced by the admission of the audio recording from Victim's phone. Police found Victim deceased in Defendant's bedroom surrounded by blood "everywhere," with Defendant lying next to Victim "covered in blood." Victim died from multiple blows to her head, and her hands were covered in bruises consistent with defensive wounds. The forensic examiner who testified at trial ruled Victim's death a homicide. Various items, including shattered pieces of a boat oar and a plant stand, were seized from the crime scene and admitted at trial, all of which had blood or hair on them. Finally, Defendant confessed to murdering Victim during a recorded interrogation with Detective.[6] Given the substantial evidence of guilt presented to the trial court, Defendant was not prejudiced by the admission of the audio recording from Victim's phone, and accordingly, reversal would not be required in this case even if the trial court erred in admitting it. *See Burton*, 320 S.W.3d at 176. Defendant's first point on appeal is denied.

## III. CONCLUSION

The trial court's judgment is affirmed.

_____
ROBERT M. CLAYTON III, Presiding Judge

Philip M. Hess, J., and
Cristian M. Stevens, J., concur.

---

[6] See Section II.A. of this opinion.

12